1  BYRON COOPER (State Bar No. 166578)
   530 Lytton Avenue, Suite 200
2  Palo Alto, California 94301
   Telephone: (650) 283-4244
3  Facsimile: (650) 617-3201
   Email: bcooper@teklaw.co
4
   Attorneys for Plaintiff
5  MEDIOSTREAM, INC.

6

7                  UNITED STATES DISTRICT COURT

8            FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                      SAN JOSE DIVISION

10

11  MEDIOSTREAM, INC.,,                Case No. **CV 11-03095**

12              Plaintiff,             **COMPLAINT FOR ANTITRUST,** HRL
                                       **UNFAIR COMPETITION,**
13         v.                          **MISAPPROPRIATION OF TRADE**
                                       **SECRETS, AND CONVERSION.**
14  MICROSOFT CORPORATION. APPLE INC.,
    SONIC SOLUTIONS, INC., SONY
15  CORPORATION, SONY CORPORATION OF   **DEMAND FOR JURY TRIAL**
    AMERICA, JAMES OWEN TAYLOR and
16  DOES 1 THROUGH 10, inclusive.

17              Defendants.

18

19  Plaintiff MEDIOSTREAM, INC. for its Complaint against Defendants MICROSOFT

20  CORPORATION, APPLE INC., SONIC SOLUTIONS, INC., SONY CORPORATION, SONY

21  CORPORATION OF AMERICA, JAMES OWEN TAYLOR and DOES 1 THROUGH 10, inclusive

22  (collectively "Defendants"), alleges:

23                  **I.     NATURE OF THE ACTION**

24       1.     This is an action under Sections 1 and 2 of the Sherman Act to restrain anticompetitive

25  conduct by defendant Microsoft Corporation, and to remedy the effects of its past unlawful conduct.

26  This action also seeks to remedy Defendants unfair competitive acts, misappropriation of trade secrets,

27  conversion of MedioStream's property and other unlawful conduct.

28                  **II.    THE PARTIES**

    COMPLAINT FOR ANTITRUST                        CASE NO.

1    2.    Plaintiff MedioStream, Inc. ("MedioStream") is a California corporation that maintains

2    its principal place of business at 4962 El Camino Real, Suite 201, Los Altos, CA 94022.

3    3.    Upon information and belief, defendant Microsoft Corporation ("Microsoft") is a

4    Washington corporation with its principal place of business at One Microsoft Way, Redmond, WA

5    98052-6399.

6    4.    Upon information and belief, defendant Apple Computer, Inc. ("Apple") is a Delaware

7    corporation with its principle place of business at 1 Infinite Loop, Cupertino, CA 95014.

8    5.    Upon information and belief, defendant Sonic Solutions ("Sonic") is a California

9    corporation with its principal place of business at 101 Rowland Way, Novato, CA 94945.

10    6.    Upon information and belief, defendant Sony Corporation ("Sony") is a corporation of

11    Japan with its principal place of business at 1-7-1 Konan Minato-ku, Tokyo, 108-0075, Japan.

12    7.    Upon information and belief, defendant Sony Corporation Of America ("Sony

13    America"), is a Delaware corporation with its principal place of business at 550 Madison Avenue,

14    New York, NY.

15    8.    Upon information and belief, defendant James Owen Taylor ("Taylor") is an individual

16    who resides at 1039 Papago Drive, Fox Island, Washington.

17    9.    The identities of the defendants named herein as DOES 1 through 10, inclusive, are

18    unknown to Plaintiff at this time, therefore Plaintiff will amend its complaint to identify the names and

19    identities of Defendants named herein as DOES 1 through 10 upon discovering such information.

## III.    JURISDICTION AND VENUE

21    10.    This Court has jurisdiction over this matter pursuant to Section 4 of the Sherman Act,

22    15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337.

23    11.    This Court has subject matter jurisdiction over state law causes of action under 28

24    U.S.C. § 1332(a)(2).

25    12.    Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22,

26    and under 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

27    13.    The personal jurisdiction of this Court over defendant Microsoft in this case is proper

28    because, on information and belief, Microsoft, through various commercial arrangements has engaged

1    in continuous and systematic activities within the State of California by *inter alia*, placing software

2    products into the stream of commerce, which stream is directed at the State of California, including

3    this district, with the knowledge and/or understanding that such products would be sold in the State of

4    California, including this district.

5            14.    The personal jurisdiction of this Court over defendant Apple in this case is proper

6    because, on information and belief, Apple, through various commercial arrangements has engaged in

7    continuous and systematic activities within the State of California by *inter alia*, placing software

8    products into the stream of commerce, which stream is directed at the State of California, including

9    this district, with the knowledge and/or understanding that such products would be sold in the State of

10   California, including this district.

11           15.    The personal jurisdiction of this Court over defendant Sonic in this case is proper

12   because, on information and belief, Sonic, through various commercial arrangements has engaged in

13   continuous and systematic activities within the State of California by *inter alia*, placing software

14   products into the stream of commerce, which stream is directed at the State of California, including

15   this district, with the knowledge and/or understanding that such products would be sold in the State of

16   California, including this district.

17           16.    The personal jurisdiction of this Court over defendant Sony in this case is proper

18   because, on information and belief, Sony, through various commercial arrangements has engaged in

19   continuous and systematic activities within the State of California by *inter alia*, placing software

20   products into the stream of commerce, which stream is directed at the State of California, including

21   this district, with the knowledge and/or understanding that such products would be sold in the State of

22   California, including this district.

23           17.    The personal jurisdiction of this Court over defendant Sony America in this case is

24   proper because, on information and belief, Sony America, through various commercial arrangements

25   has engaged in continuous and systematic activities within the State of California by *inter alia*, placing

26   software products into the stream of commerce, which stream is directed at the State of California,

27   including this district, with the knowledge and/or understanding that such products would be sold in

28   the State of California, including this district.

COMPLAINT FOR ANTITRUST          - 3 -          CASE NO.

1    18.    The personal jurisdiction of this Court over defendant Taylor in this case is proper

2  because, on information and belief, Taylor, through various commercial arrangements has engaged in

3  continuous and systematic activities within the State of California by *inter alia*, traveling to California

4  to conduct business, including this district and serving as an officer of a California corporation.

5

6                        **IV.    BACKGROUND FACTS**

7  **A.    MedioStream's Technology.**

8    19.    Plaintiff MedioStream (originally named Medio Systems) was formed in 1998 by a

9  programmer who wrote special microprocessor instructions to speed up digital video processing, one

10  of the most taxing operations on a computer's processor. A year later, during the 1999 Las Vegas

11  Consumer Electronics Show, Plaintiff's first product was featured on the front page of the EE Times

12  because it made recording video (MPEG-2 at standard resolution) in real-time on a Windows-based

13  computer possible using only its software encoder. Plaintiff began planning a consumer software

14  video product to record digital video on the personal computer in real-time, something previously

15  done only by professionals using very expensive computers.

16    20.    In early September 2000, Plaintiff hired John Huang (the inventor of its issued patents

17  and designer of the first professional DVD video disk authoring application for Windows-based

18  computers) to design an application for consumers using Plaintiff's unique technology. Mr. Huang

19  was very impressed with Plaintiff's core innovative technology and immediately conceived an

20  inventive software application that would take advantage of this technology as well as his knowledge

21  and expertise in the video processing and disk authoring field. Examples of Plaintiff's early core

22  technology are found in its early patent applications. The result was a video product that was faster,

23  more efficient, and required fewer computer resources to run than anything on the consumer market in

24  September 2000. Mr. Huang's combination of professional video expertise and knowledge of the

25  video market gave him a unique perspective when combined with Plaintiff's advanced technologies.

26  Many who saw MedioStream's plans for a consumer video product under non-disclosure agreements

27  sought to copy it. After reducing the invention to practice in late 2001, Plaintiff filed patent

28

COMPLAINT FOR ANTITRUST        - 4 -        CASE NO.

1   applications in July 2002 to protect Mr. Huang's inventions, as it had done with numerous other

2   technology innovations since 1999.

3        21.    Plaintiff's neoDVDstand software is an integrated computer software application that

4   combined video format conversion and disk authoring, allowing any user to record video on a DVD or

5   CD disk that would play on any consumer's DVD player connected to a TV.  Plaintiff's integrated

6   software made video processing and disk authoring so simple that only a few inputs, e.g., the media

7   format the consumer wanted to record (e.g. DVD or VCD) and the television standard where the

8   recorded disk media would be played, were needed to create a video disk on nearly any basic personal

9   computer system.  Plaintiff's consumer software application was built using Plaintiff's video and

10   sound processing technology developed by Plaintiff to allow personal computers to achieve what

11   could previously only be achieved on very high end expensive computers.  Plaintiff developed an

12   application programmer interface (API) for running on any Windows based computer to execute

13   software and perform media processing of sound and video desired by its software.

14        22.    Early attempts at software-only video encoding applications for personal computers

15   were very slow and often overwhelmed the computer's processor.  Software for real-time video

16   capture, video format conversion and disk authoring required significant hard disk storage for very

17   large temporary files while the video was being processed because most software encoders could not

18   process video in real time.  Additionally, video capture, video format conversion and disk authoring

19   usually required several programs and additional disk storage for partially processed video files within

20   the video encoding software and for video files in-between applications.  In order to speed up

21   processing, significant hardware upgrades were required such as dedicated (hardware) video

22   processors for encoding and hard disk drives with increased speed, capacity and caching capabilities,

23   not usually available on standard consumer computers.  Video format conversion and disk authoring

24   required significant investments in expensive software (multiple programs for video format

25   conversion, editing and disk authoring) and hardware (dedicated video processor and/or hard disk

26   drive upgrades).

27        23.    Plaintiff's neoDVDstandard 1.0 product was launched in July of 2001.  Plaintiff was a

28   small start-up with limited resources, and despite its diligent efforts could not complete its full product

COMPLAINT FOR ANTITRUST       - 5 -       CASE NO.

1   design with all of the planned features until nearly the end of 2001 when Plaintiff launched

2   neoDVDstandard 2.0, a consumer video product that achieved substantial success. Plaintiff's

3   neoDVD video products were so innovative that they were featured in stories by television news

4   broadcasts around the country between October and December 2001. Mr. Huang's invention took the

5   work and expertise, as well as much of the cost, out of recording a DVD or VCD disk for playback on

6   the DVD players used by millions of consumers. After the invention, anyone could record video on a

7   DVD or CD disk that would play on their DVD player connected to a TV. Plaintiff's software made

8   video processing and disk authoring so simple that only a few inputs were needed to create a video

9   disk on nearly any basic personal computer system. In 2000 a DVD burner cost well over $1000 and

10  2001 the price fell to about $500, therefore most computers for the average consumer did not have a

11  DVD burner because these devices were prohibitively expensive. Mr. Huang designed a product

12  capable of recording video on a CD that could be played back on everyone's DVD player, with

13  millions already attached to televisions in the US.

14      24.     Video on a CD, called Video CD (or VCD) after the standard created for the

15  recordings, is similar to DVD video, but has lower resolution and other qualities. The VCD standard,

16  however, was not well known or used much in the US, but was well known and used in overseas

17  markets. Mr. Huang understood most DVD players were designed to play a Video CD compliant CD

18  disk, so he designed his consumer video recording software with the capability to author video using

19  the CD burner already on most consumers' computer. However, those who upgrade or bought

20  computer systems with a DVD burner could use the same software to make a higher resolution DVD.

21  The parameters required to record a VCD are not the same as the parameters for recording a DVD,

22  and understanding the difference required significant knowledge and skill.

23      25.     Mr. Huang's video product would make the appropriate technical decisions for the

24  consumer in selecting the appropriate video parameters and arranging them in the very precise manner

25  required to create a video disk that could be played on any DVD player connected to a TV. The

26  software was so simple that it only two pieces of information - the media format the consumer

27  ultimately wanted to record (e.g. DVD or VCD) and the television standard where the recorded disk

28  media would be played or watched. This was the minimum information required by the program

COMPLAINT FOR ANTITRUST        - 6 -            CASE NO.

1   because the parameters for writing the video to disk differs in significant ways depending on the

2   television system (for example, NTSC in the US and PAL in Germany) and the media format (DVD or

3   VCD).

4          26.    The ability to create a standard DVD or VCD that could be played on DVD players

5   connected to millions of televisions around the world would make a consumer's personal computer

6   immediately useful in new ways.  For example, anyone who wanted to send videos to relatives or

7   business associates anywhere in the world using existing digital recorders, cameras or any other

8   sources of video, could now do so without expensive equipment and technical expertise. When

9   Plaintiff's neoDVDstandard 2.0 product was launched, it brought the cost of a system for recording a

10  video that could be played on any DVD player connected to any television from over $100,000 to

11  under $1000, with software that cost under $100.

12         27.    By the time Plaintiff's first patent issued on March 7, 2006, Plaintiff had disclosed its

13  consumer video plans to other companies under non-disclosure agreements in an effort to find partners

14  for development.  Despite signing the non-disclosure agreements, many incorporated the patented

15  features into their future products that flooded the market.  Before Plaintiff's technology was disclosed

16  to Defendants, it was difficult for ordinary computer users to make a video disk using video from the

17  internet or a video camera.  For example, digital video on a computer can be displayed in any size or

18  frame rate, and often the parameters such as video size, frame rate, video compression, sound

19  compression, among others are unknown to the consumer.  Preparing video with unknown properties

20  for recording on disk media for playback on standard devices such as a DVD player connected to a TV

21  required knowledge and expertise of video standards for disk media, compression standards, and TV

22  standards, among other things.

23         28.    Although a user may know s/he wants to make a DVD video (not a VCD or SVCD),

24  and the DVD video will be displayed in the US (using the NTSC standard), processing the video

25  information using the correct parameters into the required format for writing to disk media required

26  knowledge and expertise in many areas, in addition to sophisticated expensive equipment running

27  multiple program applications.  One seeking to record video on disk media required knowledge

28  concerning the parameters for each output media format as well as which of the required parameters

COMPLAINT FOR ANTITRUST          - 7 -          CASE NO.

1 would work on a TV using a particular TV standard. The skills and knowledge needed to convert

2 video information into the required presentation format before the invention was very high because

3 doing so often required selection and use of several programs for converting, editing and disk

4 authoring, and many of these software applications were complex and their outputs incompatible.

   **B.    Defendnats' Conduct.**

6      29.    Microsoft is the world's largest supplier of computer software for personal computers

7 ("PCs") and possesses, and has for several decades possessed, monopoly power in the market for

8 personal computer operating systems. Microsoft's "Windows" operating systems are used in over 80%

9 of Intel processor based PCs, the dominant type of PC in the United States. More than 80% of new

10 Intel-based PCs are shipped with a version of Windows pre-installed. PC manufacturers (often

11 referred to as Original Equipment Manufacturers or "OEMs") have no commercially reasonable

12 alternative to Microsoft's operating systems for the PCs that they distribute.

13      30.    There are high barriers to entry in the market for PC operating systems. One of the

14 most important barriers to entry is the barrier created by the number of software applications that must

15 run on an operating system in order to make the operating system attractive to end users. Because end

16 users want a large number of applications available, because most applications today are written to run

17 on Windows, and because it would be prohibitively difficult, time-consuming, and expensive to create

18 an alternative operating system that would run the programs that run on Windows, a potential new

19 operating system entrant faces a high barrier to successful entry.

20      31.    Accordingly, the most significant potential threat to Microsoft's operating system

21 monopoly is not from a direct, frontal assault by existing or new operating systems, but from new

22 software products that may support, or themselves become, alternative "platforms" to which software

23 applications can be written, and which can be used in conjunction with multiple operating systems,

24 including but not limited to Windows.

25      32.    To protect its valuable Windows monopoly against such potential competitive threats,

26 and to extend its operating system monopoly into other software markets such as consumer

27 electronics, Microsoft has engaged in a series of anti competitive activities. Microsoft's conduct

28 includes agreements tying other Microsoft software products to Microsoft's Windows operating

1   system; exclusionary agreements precluding companies from distributing, promoting, buying, or using

2   products of Microsoft's software competitors or potential competitors; and exclusionary agreements

3   restricting the right of companies to provide services or resources to Microsoft's software competitors

4   or potential competitors.

5        33.    One important threat to Microsoft's Windows operating system monopoly comes from

6   standards based media platform software on the user's PC.  At the peak of the internet "dot com"

7   boom in 1999 Microsoft focused its media software efforts on server technology for streaming sound

8   and video over the internet, and maintaining its dominance in the PC market by bundling its Explorer

9   browser software with Windows to eliminate media platform competition.  After MedioStream

10   demonstrated its software for processing media on the PC and began beta testing its proprietary media

11   platform, Microsoft recognized the importance of such media processing software and sought to

12   impose a single "Windows Media platform" on all PCs similar to its strategy in the "browser wars."

13   Specifically, Microsoft sought to require all users of PCs with its Windows operating system to use

14   only Microsoft's Media platform in order to protect its PC operating system monopoly from

15   competitive threats, and use its monopoly power to expand into consumer electronics markets for

16   audio and video.

17        34.    In 2000 Microsoft did not ship media processing software with its Windows PC

18   operating systems.  Microsoft included only limited software support for sound cards to play audio

19   with its Multimedia Extensions 1.0 in the Windows 3.0 PC operating systems, and had similar

20   software in later versions of its operating systems. When MedioStream and other small start-ups

21   demonstrated their media platform and began offering media processing software that included

22   application programmer interfaces (API) and software development kits (SDK) for processing sound

23   and video on Windows based PCs, Microsoft recognized the threat this media processing software

24   posed to its operating system dominance in the PC market, as well as the potential for this software to

25   extend Microsoft's PC operating system monopoly into consumer electronic devices such as television

26   set top boxes and gaming devices.  MedioStream's media processing software and platform included

27   software for integrating media creation and playback programs with the Windows operating system

28   and relevant hardware installed on a PC, including software licensed from Microsoft, but which

COMPLAINT FOR ANTITRUST    - 9 -     CASE NO.

1  Microsoft did not bundle or include with its own sales of the Windows operating system, such as

2  Direct Show and Media Player.

3        35.    To counter the threat posed by media processing software, particularly the development

4  of competing media platforms capable of running programs to create and play music and videos on

5  any PC no matter which operating system was running on the PC, Microsoft developed its own

6  Windows Media platform for PCs and that it planned to extend to consumer electronics.   Microsoft's

7  early media processing software called Windows Media Technologies 4.0 was developed for digital

8  audio and video streaming over the Internet or other networks. Upon learning of MedioStream's

9  media platform, Microsoft quickly sought to discover the nature and specifics of MedioStream's

10  technology, and then shifted its efforts to develop a competing Windows Media platform for PCs into

11  high gear as the company's number one priority.  Evidence of the importance Microsoft placed on its

12  effort to develop a Windows Media platform for PCs (originally called the Windows Media 9 Series

13  platform) can be found at its 2002 launch when the chief software architect Bill Gates estimated the

14  company had spent about $500 million dollars developing the platform over the previous two years.

15        36.    Microsoft's Media platform for PCs has been developed over the years to include the

16  following components for processing sound and video and integrating media software applications: (1)

17  codecs (encoders and decoders), which compress and decompress content to meet bandwidth and

18  storage space requirements; (2) digital rights management (DRM) technology, which gives content

19  owners a way to define what end users may do with a particular piece of content (e.g., copy it a certain

20  number of times) and enforces these restrictions across applications and devices, (3) the Windows

21  Media Format, Microsoft's efforts to create a standard for packaging media content that it would own

22  and would be understood by many different applications and devices; and (4) tools that enable content

23  owners, software application developers, and hardware manufacturers to support the platform in their

24  products.

25        37.    Components of the Windows Media platform have found their way into Microsoft's PC

26  operating systems beginning in 1999 when Microsoft began bundling its Windows Media Player with

27  most versions of the desktop OS since Windows 95.  Microsoft sought advances in the Windows

28  Media platform while excluding or offering limited support for competing platforms. Beginning with

COMPLAINT FOR ANTITRUST      - 10 -      CASE NO.

1  Windows 2000, every version of Windows Server shipped with Windows Media Services, used for

2  hosting and streaming Windows Media files over the internet or local area networks. Microsoft

3  enthusiastically promoted the platform to content owners, independent software vendors (ISVs),

4  device makers, and consumer electronics companies.  Microsoft spent the next few years desperately

5  trying to catch up to the early innovators in the media platform market.

6       38.    Making Windows Media platform the exclusive media processing software on the PC

7  market became the most importance goal at Microsoft - at the 2002 launch of the Windows Media 9

8  Series platform, Chief Software Architect Bill Gates estimated that the company had spent about US

9  $500 million dollars developing the platform over the previous two years. The platform skipped from

10  version 4 to version 7 in 2000, signaling Microsoft's efforts to leap forward to catch up to its

11  competition for the media platform on the PC.

12       39.    To protect its valuable Windows monopoly against such potential competitive threats,

13  and to extend its operating system monopoly into the media platform, consumer electronics, and other

14  software markets, Microsoft has engaged in a series of anti competitive activities. Microsoft's conduct

15  includes agreements tying other Microsoft software products to Microsoft's Windows operating

16  system; exclusionary agreements precluding companies from distributing, promoting, buying, or using

17  products of Microsoft's software competitors or potential competitors; and exclusionary agreements

18  restricting the right of companies to provide services or resources to Microsoft's software competitors

19  or potential competitors.

20       40.    One important source of potential competition for Microsoft's Windows operating

21  system monopoly comes from standard based media processing software that runs media software

22  designed for the media platform.  Microsoft spent $500 million between 2000 and 2002 in order to

23  develop or create such software according to Bill Gates at the 2002 launch of the Windows Media 9

24  Series platform.  Microsoft's potential competitors were pursuing their own media platforms, with

25  each moving their key APIs into the client to commoditize the underlying operating system.

26       41.    Standards based media processing software using an integrated media platform posed a

27  competitive threat to Microsoft's operating system monopoly in three basic ways. First, as discussed

28  above, one of the most important barriers to the entry and expansion of potential competitors to

COMPLAINT FOR ANTITRUST     - 11 -     CASE NO.

1    Microsoft in supplying PC operating systems is the large number of software applications that will run

2    on the Windows operating system, but not on other operating systems (for example, Unix, Sun, OS X,

3    among others). If application programs could be written using a competitor's SDK to run on any

4    operating systems containing the competitor's API, competition in the market for operating systems

5    could be revitalized. The combination of new media processing technology and new programs that

6    allow consumers to create and play their music and videos on any computer independent of the

7    operating system held out this promise. Microsoft's competitors sought to distribute SDKs designed in

8    part to permit application software designers to write media software that could be run on different

9    operating systems running the API. Any such media platform threatens to reduce or eliminate one of

10   the key barriers to entry protecting Microsoft's operating system monopoly.

11        42.    Non-Microsoft media processing software on an integrated media platform is perhaps

12   the most significant vehicle for distribution of media technology to end users. Microsoft recognized

13   that the widespread use of media processing software on an integrated media platform other than its

14   own threatened to increase the distribution and use of competitors SDKs and APIs, and in so doing

15   threatened Microsoft's operating system monopoly. For this reason, Microsoft sought to monopolize

16   the media processing software field by imposing its media platform to exclude its competitors.

17        43.    Second, Microsoft recognized that MedioStream's media processing software was itself

18   a "platform" to which many applications could written, and further that if it thrived many software

19   applications would be written for such competitors' media platforms. MedioStream created APIs and

20   SDKs for its media processing software, with the intention of providing APIs to run on many different

21   PC operating systems, therefore the success of such alternative platforms also threatened to reduce or

22   eliminate a key barrier protecting Microsoft's operating system monopoly. These APIs running on

23   computers using different operating systems would essentially commoditize the operating system

24   making them less relevant to consumer software for creating and playing music and video.  Microsoft

25   sought to make sure the only media platform that would run on a Windows operating system PC

26   would be the Windows Media platform.

27        44.    Third, Microsoft recognized the declining importance of the PC in the consumer's

28   home.  MedioStream's media platform integrated the software and hardware on a PC making it

COMPLAINT FOR ANTITRUST        - 12 -        CASE NO.

1   operate more like other consumer electronic devices.  In fact, MedioStream made plans to

2   implementing its media processing software in PCs running different operating systems as well as

3   consumer electronic devices.  Microsoft was planning to launch into the consumer electronic device

4   market with its X-Box game device to extend its operating system monopoly to consumer's other

5   electronic devices.  MedioStream's media platform running on consumer electronic devices posed a

6   considerable threat to Microsoft's expansion into the consumer electronics market.

7       45.   To respond to the competitive threat posed by MedioStream's media processing

8   software, Microsoft embarked on an extensive campaign to market and distribute Microsoft's own

9   media platform that it referred to as the "Windows Media platform." Microsoft has described its

10  campaign in the same manner as it described it's "browser war" against Netscape.

11      46.   Because of its vast resources, Microsoft was well positioned to obtain and market a

12  media platform in competition its competitors, like MedioStream and Nero. Indeed, continued

13  competition on the merits between MedioStream's SDK for its "neoDVD" brand media processing

14  software, Nero's suite of media processing software, and Microsoft's Windows Media platform

15  programs such as Movie Maker would have resulted in greater innovation in the market and the

16  development of better products. In the absence of Microsoft's anti competitive conduct, the offsetting

17  advantages of Microsoft's size and dominant position in desktop software and its smaller competitor's

18  (e.g. MedioStream, Nero, Cyberlink) position as the media platform innovators, as well as the benefit

19  to consumers of greater product offerings and features, could have been expected to sustain

20  competition on the merits between these companies, and perhaps others that have entered and might

21  enter the media platform market.

22      47.   Microsoft, however, has not been willing simply to compete on the merits. Instead,

23  Microsoft has leveraged its OS assets to force OEMs and consumers to use its media platform. Thus,

24  Microsoft began, and continues today, a pattern of anticompetitive practices designed to thwart media

25  platform competition on the merits, to deprive customers of a choice between alternative media

26  processing software on an integrated media platform, and to exclude Microsoft's media platform

27  competitors.

28

COMPLAINT FOR ANTITRUST          - 13 -          CASE NO.

48.     Microsoft's conduct with respect to media processing software on an integrated media platform is a prominent and immediate example of the pattern of anti competitive practices undertaken by Microsoft with the purpose and effect of maintaining its PC operating system monopoly and extending that monopoly to other related markets, such as consumer electronics.

49.     Microsoft first attempted to eliminate competition from others with an early announcement that it would incorporate a media platform into all of its PC operating systems, but Microsoft did not have the technology. Despite Microsoft's early announcements, MedioStream was successful licensing its media platform technology to Sony Corporation of Japan, and all of its subsidiaries worldwide.  Sony distributes both computers and consumer electronic devices in the US, and MedioStream's agreement represented a major victory for MedioStream.

50.     Having failed to stop its competitors with false announcements to the market, Microsoft set about to exclude MedioStream and other media platform rivals from access to the distribution, promotion, and resources they needed to offer their media platform products to OEMs and PC users.  Microsoft sought to block widespread distribution of its competitors SDKs and APIs by making changes to its operating system that essentially prevented its competitors media platforms from becoming operating as they had in the past while delaying its competitors' product introductions in order to adapt to Microsoft's OS changes.

51.     First, Microsoft invested hundreds of millions of dollars to develop, test, and promote Windows Media platform and related software, a product which it distributes without separate charge. Everything Microsoft's competitors were selling, Microsoft gave away for free. This is the same strategy Microsoft used in the browser wars as reported in the Financial Times when then Microsoft CEO Bill Gates warned competitors in June 1996: "Our business model works even if all Internet software is free .... We are still selling operating systems. What does Netscape's business model look like? Not very good."

52.     But Microsoft did not stop at free distribution. Rather, Microsoft purposefully set out to do whatever it took to make sure significant market participants distributed and used only the Windows Media platform and related software instead of MedioStream's or Nero's media platform -- including pressuring OEMs by using its unique control over Windows to induce them to only support

the Windows Media platform on their computers. For example, although MedioStream met with Sony,
Hewlett Packard, Dell, Gateway and other OEMs early in the development of its media platform, Only
Sony adopted MedioStream's media platform when it was the first on the market, but eventually
Microsoft convinced nearly all OEMs to reduce or eliminate support for any platform other than the
Windows Media platform.

53.     Second, Microsoft essentially forced all PC manufacturers, by incorporating the major
components of Windows Media platform and related software into all versions of Windows, to include
the Windows Media platform with every PC such manufacturers shipped. By virtue of the monopoly
position Windows enjoys, it was a commercial necessity for OEMs to preinstall a Windows operating
system such as Windows XP or Vista --and, as a result of Microsoft's illegal tie-in, Windows Media
platform and related software --on virtually all of the PCs they sold. Microsoft thereby unlawfully tied
its Windows Media platform and related software to the Windows XP, Windows Vista, and nearly
every other version of its monopoly operating system and unlawfully leveraged its operating system
monopoly to require PC manufacturers to license and distribute Windows Media platform and related
software on every PC those OEMs shipped with Windows.

54.     Third, Microsoft intends to continue to unlawfully tie its media platform software to its
new Windows operating systems in the foreseeable future, unless enjoined. Microsoft has made clear
that, unless restrained, it will continue to misuse its operating system monopoly to artificially exclude
media platform competition and deprive customers of a free choice between media processing
software.

55.     Microsoft designed Windows XP and its follow on Windows operating systems so that
removal of Windows Media platform and related software by OEMs or end users is operationally
difficult. Its prior operating system, Windows 98, did not contain Windows Media platform
components since they were originally intended for Microsoft's servers only.  However,
MedioStream's unique innovations made video processing on the PC for the average consumer a
reality for a very low price for the first time.  Although it is technically feasible and practicable to
remove Microsoft's Media platform software from Windows XP, Windows XP Media Center,

1   Windows Vista, and Windows 7, and to substitute other media platform software, OEMs are

2   essentially prevented from doing so by Microsoft.

3          56.     Media processing software such as Windows Media platform and its related programs

4   are separate products competing in a separate product market from PC operating systems, and it is

5   efficient to supply the two products separately. Indeed, Microsoft itself has consistently offered,

6   promoted, and distributed its Windows Media platform and related programs as standalone products

7   separate from, and not as a component of, Windows, and intends to continue to do so after the release

8   of Windows 8. For example, Microsoft will make available separately the same media platform

9   programs that are bundled with Windows 7, through an upgrade that if distributed and installed wholly

10  apart from Windows 7 and Microsoft has offered non-Windows, non-Microsoft operating systems

11  versions of its media platform software. In addition Microsoft already plans to introduce a subsequent

12  version of Windows Media platform and related software that also will be distributed and installed

13  separately from Windows 8, including for non-Windows, non-Microsoft operating systems.

14         57.     Microsoft's tying of its media platform to its monopoly operating system reduces the

15  ability of customers to choose among competing media platform products because it forces OEMs and

16  other purchasers to license or acquire the tied combination whether they want Microsoft's media

17  platform or not. Microsoft's tying --which it can accomplish because of its monopoly power in

18  Windows --impairs the ability of its media platform rivals to compete to have their media processing

19  software on an integrated media platform preinstalled by OEMs on new PCs and thus substantially

20  forecloses those rivals from an important channel of media platform distribution that Microsoft

21  deliberately controls through its operating system monopoly. See for example,

22  http://www.pbs.org/cringely/pulpit/2004/pulpit_20040408_000808.html.

23         58.     Microsoft executives have repeatedly recognized the significant advantage that

24  Microsoft (and only Microsoft) receives by tying its media platform to its operating system, rather

25  than having to compete on the merits. Just as it did with its browser software (Internet Explorer).

26         59.     Collectively, Microsoft's agreements with OEMs restrained, and, unless enjoined, will

27  continue to unreasonably restrain competition in the market for media processing software on an

28  integrated media platform. They artificially increase the share of the market held by Microsoft's

COMPLAINT FOR ANTITRUST          - 16 -          CASE NO.

1 | Windows Media platform and related software, not because OEMs or PC customers have freely

2 | chosen Microsoft's product in a competitive marketplace, but because of the illegal exercise of

3 | monopoly power by Microsoft.

4 |      60.    Neither the antitrust laws nor this action seeks to inhibit Microsoft from competing on

5 | the merits by innovation or otherwise. Rather, the Complaint challenges only Microsoft's concerted

6 | attempts to maintain its monopoly in operating systems and to achieve dominance in other markets,

7 | not by innovation and other competition on the merits, but by tie-ins, exclusive dealing contracts, and

8 | other anticompetitive agreements that deter innovation, exclude competition, and rob customers of

9 | their right to choose among competing alternatives.

10 |      61.    Microsoft's conduct adversely affects innovation by:

11 |      a.    impairing the incentive of Microsoft's competitors and potential competitors to

12 |      undertake research and development, because they know that Microsoft will be able to limit

13 |      the rewards from any resulting innovation;

14 |      b.    impairing the ability of Microsoft's competitors and potential competitors to obtain

15 |      financing for research and development;

16 |      c.    inhibiting Microsoft's competitors that nevertheless succeed in developing promising

17 |      innovations from effectively marketing their improved products to customers;

18 |      d.    reducing the incentive and ability of OEMs to innovate and differentiate

19 |      their products in ways that would appeal to customers; and

20 |      e.    reducing competition and the spur to innovation by Microsoft and others that only

21 |      competition can provide.

22 |      62.    The purpose and effect of Microsoft's conduct with respect to media processing

23 | software on an integrated media platform have been and, if not restrained, will be:

24 |      a.    to preclude competition on the merits between Microsoft's media platform and other

25 |      media processing software on an integrated media platform;

26 |      b.    to preclude potential competition with Microsoft's operating system from competing

27 |      media processing software on an integrated media platform and from other companies and

28 |

COMPLAINT FOR ANTITRUST     - 17 -     CASE NO.

1     software whose use is facilitated by these media processing software on an integrated media

2     platform;

3         c.     to extend Microsoft's Windows operating system monopoly to the media platform

4     market; and

5         d.     to maintain Microsoft's Windows operating system monopoly.

6         63.     In early 1998 Jim Taylor worked as an onsite consultant at Microsoft with the title

7 "DVD Evangelist." Taylor worked in Microsoft's division responsible for the development of its

8 Direct Show software, and routinely attended trade shows for Microsoft. Taylor also worked with

9 Sonic Solutions, Inc. while he was working at Microsoft. Taylor joined Daikin Comtec as its chief

10 technology officer in 2000 shortly before Sonic Solutions purchased Daikin. In September 2000

11 MedioStream sent Daikin materials related to MedioStream's SDK and APIs, and a mutual NDA.

12 Daikin evaluated MedioStream's SDK under the NDA. Shortly after Daikin evaluated MedioStream's

13 SDK, Taylor joined Sonic Solutions.

14         64.     Sonic originally wrote digital sound software for Apple Macintosh computers. In about

15 1999 Sonic entered the professional digital video business for Apple workstations. Sonic was aware of

16 MedioStream's products displayed at the November 1999 COMDEX show. In March 2000 Sonic

17 requested information about MedioStream's "great technology...." After signing MedioStream's NDA

18 in 2000, Sonic began evaluating beta versions of MedioStream's technology, including MedioStream's

19 MPEG-2 encoder and SDK. At the time Sonic did not have an SDK of its own.

20         65.     From about mid-November 1999 to about early March 2000, MedioStream and Apple

21 had discussions and meetings about Apple's potential use of MedioStream's technology. In January

22 2000 several MedioStream executives attended meetings at Apple's headquarters in Cupertino,

23 California. These meetings included Apple's senior executives, including its founder Steve Jobs.

24 Apple evaluated MedioStream's products and technology after signing several NDAs. Apple

25 continued evaluating MedioStream's technology and products through at least early March 2000.

26 Sonic was working with Apple at the time Apple was evaluating MedioStream's technology.

27         66.     Between the middle of 2000 and early 2001 MedioStream approached numerous video

28 editing and authoring software companies regarding its new SDK that used MedioStream's API for

1  video software applications. MedioStream's API contained a common control structure that could be

2  used by several video applications to interact with Microsoft Windows components available with the

3  SDK. MedioStream also approached all the major PC OEM's regarding the use of its media platform

4  on their PCs shipped to consumers. Sometime in 2001 Sonic and Taylor began working closely with

5  Microsoft to develop an SDK and media platform for the Windows PC operating system very similar

6  to MedioStream's products and technology. In about July 2001 Sonic and Microsoft jointly

7  announced that major media platform components developed by Sonic would be included in future

8  versions of Windows operating systems.

9       67.    MedioStream was the only authoring software company with +VR support in its

10  products at the end of 2002, and was the only company with technology to provide the DVD-VR

11  output media format. Many Japanese companies that use these formats consider them critical features.

12  For example, the DVD-VR output media format was one of the formats used by all of Sony's video

13  cameras and other consumer DVD devices, and it was the output media format of choice in the Japan

14  market, but MedioStream was the only company that could integrate this format in a video software

15  product with the DVD-video output media format. The -VR format is also used by Sony's cameras in

16  the US.

17            **V.    MICROSOFT'S PRIOR RELATED CASES**

18       **A.    US v. Microsoft July 1994 Monopolization Case.**

19       68.    On July 15, 1994, the United States commenced an action against Microsoft under

20  Section 2 of the Sherman Act for unlawfully maintaining its monopoly in the market for PC operating

21  systems. The complaint alleged, among other things, that Microsoft had engaged in anti competitive

22  agreements and marketing practices directed at OEMs. These agreements included agreements that

23  required OEMs to pay Microsoft for each non-Microsoft operating system that they distributed and

24  long-term agreements that required unreasonably large minimum commitments from OEMs. The

25  effect of Microsoft's practices and agreements was unlawfully to maintain its monopoly in the PC

26  operating system market.

27       69.    Microsoft consented to the entry of a final judgment, and the Court entered the Final

28  Judgment on August 21, 1995. The Final Judgment prohibited Microsoft from continuing the

COMPLAINT FOR ANTITRUST     - 19 -     CASE NO.

1  challenged practices and agreements and prohibited Microsoft from engaging in certain other conduct

2  that could have similar anti competitive results, including (in Final Judgment § IV(E)) enjoining

3  Microsoft from conditioning licenses to its operating system on an OEM's either licensing another

4  Microsoft product or agreeing not to license or distribute a non-Microsoft product.

5         70.    The purpose of § IV(E) of the Final Judgment was to prevent Microsoft from

6  conditioning access to its monopoly operating system in order to protect or extend that monopoly. See

7  Competitive Impact Statement, 50 Fed. Reg. 42845, 42852 (1994).

8         **B.    US v. Microsoft October 1997 Contempt Proceeding.**

9         71.    On October 20, 1997, the United States petitioned the Court for an order to show cause

10  why Microsoft should not be found in civil contempt for violating the 1995 Final Judgment by

11  requiring OEMs to license and distribute Microsoft's Internet browser as a condition of obtaining a

12  license for Microsoft's Windows 95 operating system.

13         72.    On December 11, 1997, the Court entered a preliminary injunction enjoining Microsoft

14  "from the practice of licensing the use of any Microsoft personal computer operating system software

15  (including Windows 95 or any successor version thereof) on the condition, express or implied, that the

16  licensee also license and preinstall any Microsoft Internet browser software (including Internet

17  Explorer 3.0, 4.0, or any successor versions thereof) pending further order of Court."

18         **C.    US v. Microsoft December 1997 Contempt Proceeding.**

19         73.    On December 15, 1997, Microsoft --without seeking any modification or clarification

20  of the Court's order and without consulting the United States --publicly announced that any OEM that

21  did not agree to license and distribute Microsoft's Internet Explorer could not obtain a license to a

22  working, current version of Microsoft' s Windows operating system. Microsoft announced that the

23  only versions of Windows 95 available to OEMs that declined to license and distribute Microsoft's

24  Internet browser would be (1) a version of Windows 95 that Microsoft itself admitted would not work

25  and (2) a two-and-a-half-year-old version of Windows 95 that Microsoft admitted was not

26  commercially viable.

27         74.    On December 17, 1997, the United States moved to have Microsoft held in contempt

28  for this clear violation of the Court's December 11, 1997 Order. On January 21, 1998, the United

COMPLAINT FOR ANTITRUST      - 20 -      CASE NO.

1 │ States and Microsoft submitted a stipulated proposed order, which was entered by the Court. The

2 │ Order required Microsoft to provide OEMs with two options in addition to those previously provided

3 │ by Microsoft:

a.      the option of installing on their PCs a version of Windows 95 that was the same as the

current December 1997 version of Windows 95 (OEM Service Release 2.5) "with the sole

exception of Internet Explorer 4.0 functionality" not included; and

b.      the option of shipping their PCs after removing the Internet Explorer "icon" from the

desktop and from the "Start menu" within Windows 95.

**D.    US v. Microsoft 1998 Antitrust Cases.**

75.    *United States v. Microsoft* was a set of consolidated civil actions filed against

Microsoft Corporation pursuant to the Sherman Antitrust Act on May 18, 1998 by the United States

Department of Justice (DOJ) and 20 U.S. states. The plaintiffs alleged that Microsoft abused

monopoly power on Intel-based personal computers in its handling of operating system sales and web

browser sales. The issue central to the case was whether Microsoft was allowed to bundle its flagship

Internet Explorer (IE) web browser software with its Microsoft Windows operating system. Bundling

them together is alleged to have been responsible for Microsoft's victory in the browser wars as every

Windows user had a copy of Internet Explorer. It was further alleged that this unfairly restricted the

market for competing web browsers (such as Netscape Navigator or Opera) that were slow to

download over a modem or had to be purchased at a store. Underlying these disputes were questions

over whether Microsoft altered or manipulated its application programming interfaces (APIs) to favor

Internet Explorer over third party web browsers, Microsoft's conduct in forming restrictive licensing

agreements with original equipment manufacturer (OEMs), and Microsoft's intent in its course of

conduct.

76.    Microsoft stated that the merging of Microsoft Windows and Internet Explorer was the

result of innovation and competition, that the two were now the same product and were inextricably

linked together and that consumers were now getting all the benefits of IE for free. Those who

opposed Microsoft's position countered that the browser was still a distinct and separate product which

did not need to be tied to the operating system, since a separate version of Internet Explorer was

1    available for Mac OS. They also asserted that IE was not really free because its development and

2    marketing costs may have kept the price of Windows higher than it might otherwise have been. The

3    case was tried before Judge Thomas Penfield Jackson in the United States District Court for the

4    District of Columbia.

5          77.    On November 2, 2001, the DOJ reached an agreement with Microsoft to settle the case.

6    The proposed settlement required Microsoft to share its application programming interfaces with

7    third-party companies and appoint a panel of three people who will have full access to Microsoft's

8    systems, records, and source code for five years in order to ensure compliance. The Settlement's

9    requirements were primarily designed to ensure there were stringent oversight procedures and explicit

10   requirements to prevent Microsoft from engaging in "Predatory Behavior" or other practices that

11   might form a "Barrier to Entry". However, the DOJ did not require Microsoft to change any of its code

12   nor prevent Microsoft from tying other software with Windows in the future. On August 5, 2002,

13   Microsoft announced that it would make some concessions towards the proposed final settlement

14   ahead of the judge's verdict. On November 1, 2002, Judge Kollar-Kotelly released a judgment

15   accepting most of the proposed DOJ settlement. Nine states (California, Connecticut, Iowa, Florida,

16   Kansas, Minnesota, Utah, Virginia and Massachusetts) and the District of Columbia (which had been

17   pursuing the case together with the DOJ) did not agree with the settlement, arguing that it did not go

18   far enough to curb Microsoft's anti-competitive business practices. On June 30, 2004, the U.S. appeals

19   court unanimously approved the settlement with the Justice Department, rejecting objections from

20   Massachusetts that the sanctions were inadequate.

21         78.    Microsoft's obligations under the settlement, as originally drafted, expired on

22   November 12, 2007. However, Microsoft later "agreed to consent to a two-year extension of part of

23   the Final Judgments" dealing with communications protocol licensing.  The court released Microsoft

24   from the supervision imposed by the settlement in early 2011.

25         E.     European Union v. Microsoft Competition Cases.

26         79.    The *European Union v. Microsoft* competition case was brought by the European

27   Commission of the European Union (EU) against Microsoft for abuse of its dominant position in the

28   market. Novell complained to the Commission about Microsoft's licensing practices in 1993, and

COMPLAINT FOR ANTITRUST          - 22 -          CASE NO.

1    eventually resulted in the EU ordering Microsoft to divulge certain information about its server

2    products and release a version of Microsoft Windows without Windows Media Player. In 1993,

3    Novell alleged that Microsoft was blocking its competitors out of the market through anti-competitive

4    practices. The complaint centered on the license practices at the time which required royalties from

5    each computer sold by a supplier of Microsoft's operating system, whether or not the unit actually

6    contained the Windows operating system. Microsoft reached a settlement in 1994, ending some of its

7    license practices.

8          80.    Sun Microsystems joined the litigation in 1998 when it alleged Microsoft failed to

9    disclose some of the interfaces to Windows NT. The case widened even more when the EU started to

10   look into how media technologies were being integrated with the Windows operating system.

11         81.    Citing ongoing abuse by Microsoft, the EU reached a preliminary decision in the case

12   in 2003 and ordered the company to offer both a version of Windows without Windows Media Player

13   and the information necessary for competing networking software to interact fully with Windows

14   desktops and servers. In March 2004, the EU ordered Microsoft to pay €497 million ($794 million or

15   £381 million), the largest fine ever handed out by the EU at the time, in addition to the previous

16   penalties, which included 120 days to divulge the server information and 90 days to produce a version

17   of Windows without Windows Media Player.

18         82.    The next month Microsoft released a paper containing scathing commentary on the

19   ruling including: "The commission is seeking to make new law that will have an adverse impact on

20   intellectual property rights and the ability of dominant firms to innovate." Microsoft paid the fine in

21   full in July 2004.

22         83.    Microsoft has a compliant version of its flagship operating system without Windows

23   Media Player available under the negotiated name "Windows XP N." In response to the server

24   information requirement, Microsoft released the source code, but not the specifications, to Windows

25   Server 2003 service pack 1 to members of its Work Group Server Protocol Program (WSPP) on the

26   day of the original deadline. Microsoft also appealed the case, and the EU held a week-long hearing.

27

28

COMPLAINT FOR ANTITRUST              - 23 -              CASE NO.

1    84.    On July 12, 2006, the EU fined Microsoft for an additional €280.5 million ($448.58

2    million), €1.5 million ($2.39 million) per day from 16 December 2005 to 20 June 2006. The EU

3    threatened to increase the fine to €3 million ($4.81 million) per day on 31 July 2006 if Microsoft did

4    not comply by then.

5    85.    On September, 17 2007, Microsoft lost its appeal in the European Commission's case.

6    The €497 million fine was upheld, as were the requirements regarding server interoperability

7    information and bundling of Microsoft's Media Player. In addition, Microsoft was assessed 80% of

8    the legal costs of the Commission, while the Commission assessed 20% of Microsoft legal costs.

9    However, the appeal court rejected the Commission ruling that an independent monitoring trustee

10   should have unlimited access to internal company organization in the future. On October 22, 2007,

11   Microsoft announced that it would comply and not appeal the decision further,] and Microsoft did not

12   appeal within the required period.

13   86.    On February 27, 2008, the EU fined Microsoft an additional €899 million ($1.44

14   billion) for failure to comply with the March 2004 antitrust decision. This represents the largest

15   penalty ever imposed in 50 years of EU competition policy. This latest decision follows a prior €280.5

16   million fine for non-compliance, covering the period from June 21, 2006 until October 21, 2007. On

17   May 9, 2008, Microsoft lodged an appeal in the European Court of First Instance seeking to overturn

18   the €899 million fine, officially stating that it intended to use the action as a "constructive effort to

19   seek clarity from the court".

20   87.    In May 2008, the EU announced an investigation of Microsoft Office's OpenDocument

21   format support.

22   88.    In January 2009, the European Commission announced it would investigate the

23   bundling of Internet Explorer with Windows operating systems from Microsoft, saying "Microsoft's

24   tying of Internet Explorer to the Windows operating system harms competition between web

25   browsers, undermines product innovation and ultimately reduces consumer choice." In response,

26   Microsoft announced that it would not bundle Internet Explorer with Windows 7 E, the version of

27   Windows 7 to be sold in Europe.

28

COMPLAINT FOR ANTITRUST          - 24 -          CASE NO.

1    89.    On December 16, 2009, the European Union agreed to allow competing browsers, with

2    Microsoft providing a "ballot box" screen letting users choose one of twelve popular products listed in

3    random order.

4         **F.    South Korea v. Microsoft Competition Cases.**

5         90.    In February 2006, the Korea Fair Trade Commission issued a final ruling that

6    Microsoft abused its dominant market position in South Korea by tying certain software to its

7    Windows operating system. The preliminary ruling came in December 2005. South Korea has rejected

8    an appeal by Microsoft to overturn the antitrust decision.

9         91.    Under the ruling, Microsoft is required to provide two separate versions of Windows

10   after August 24, 2006. One must be stripped of Windows Media Player and Windows Messenger, and

11   the other must carry links to Web pages that allow consumers to download competing versions of such

12   software.  The commission began investigating Microsoft after a local Internet portal, Daum

13   Communications Corp., filed a complaint with the commission in 2001. Microsoft reached a $30

14   million settlement with the company in November 2005.

15        92.    In September 2009 a Korean court ruled that Microsoft 's bundling practice was

16   disruptive to the market.  The Seoul Central District Court found Microsoft guilty of breaching the

17   nation's anti-trust law by bundling its Windows Media Player with its operating system.

18        **G.    Russia v. Microsoft Competition Cases.**

19        93.    In June 2009 Russia's Federal Anti-monopoly Service (FAS) launched a probe into

20   whether Microsoft broke competition law by holding back supplies of its Windows XP operating

21   system to the Russian market, and later the same month launched another probe into "coordinated

22   actions" between Microsoft and Acer Inc., Asustek, Toshiba Corp., Hewlett-Packard, Samsung

23   Electronics and Dell Inc. when selling laptops with pre-installed Windows operating systems.

24        94.    A statement on the regulator's website about the laptop maker probe said: "The signs of

25   violation of the anti-monopoly legislation are seen in coordinated actions by laptop makers which

26   have been pre-installing an operating system of the one same producer."  The Russian agency said

27   that, in most cases, customers were unable to buy a laptop from the OEM producers without the pre-

28

COMPLAINT FOR ANTITRUST          - 25 -          CASE NO.

1   installed Windows OS, or were not able to refuse to use the operating system they were given with the

2   laptops.

3         95.    Microsoft's most significant revenues comes from corporate customers, who make

4   payments on long-term licensing contracts allowing them to upgrade to the newest versions of its

5   software.  However, most customers do not upgrade immediately, forcing Microsoft to support older

6   versions of the software.  Microsoft seeks to move customers onto newer versions to save costs and to

7   get them to adopt newer standards and systems that lock them into Microsoft's technologies.

8         96.    Microsoft has stopped selling Windows XP to retailers and major computer makers,

9   forcing customers into using its successor, Windows Vista or Windows 7.

10        97.    Microsoft contends that its Windows XP OS is still available to Russian customers and

11  that Microsoft and many of its OEM partners will continue to offer technical support for Windows XP

12  until 2014.

**VI.    THE RELEVANT MARKETS**

14        98.    There are two relevant product markets: The market for personal computer operating

15  systems, and the market for media processing software.

16        **A.    PC Operating System Market.**

17        99.    The market for personal computer operating systems consists of operating systems

18  written for the Intel x 86 Pentium classes of microprocessors. These microprocessors perform central

19  processing unit ("CPU") functions for the vast majority of personal computers, and their operating

20  systems manage the interaction between the CPU and the various pieces of hardware, such as a

21  monitor or printer, attached to such computers. Operating systems also control and direct the

22  interaction between applications, such as word processing or spreadsheet programs, and the CPU. No

23  other product duplicates or fully substitutes for the operating system. The geographic market for PC

24  operating systems is worldwide.

25        100.   Because of the complex interactions among operating system software, applications

26  software, and the hardware attached to the PC, an operating system written for one class of

27  microprocessors typically will not work on another class of microprocessors without significant

28  modification. Thus, OEMs and PC users do not consider an operating system that runs non-Intel-based

COMPLAINT FOR ANTITRUST          - 26 -          CASE NO.

1  personal computers to be an effective substitute for an operating system that runs an Intel-based

2  personal computer.

3          **B. Media Processing Software (Media Platform) Market.**

4       101.   Media processing software is specialized software programs that allow PC users

5  conveniently to locate, access, display, and manipulate video and sound content and applications.

6  media processing software on a PC is essential for quick, easy, and efficient use of sound, pictures,

7  and videos on a personal computer. No other product duplicates or fully substitutes for the

8  functionality of media processing software on a personal computer. The geographic market for media

9  processing software on an integrated media platform is worldwide.

10       **C.**    **Microsoft's Windows Operating System Monopoly**

11      102.   Microsoft markets a variety of PC operating systems, including Windows XP,

12 Windows XP Media Center, and Windows 7. Beginning sometime later this year Microsoft will

13 introduce to the market the latest version of its operating system for Intel-based PCs, Windows 8.

14      103.   Microsoft has maintained a monopoly share (in excess of 80%) of the PC operating

15 system market over an extended period of time. The durability of Microsoft's market power in part

16 reflects the fact that the PC operating system market is characterized by certain economies of scale

17 and the requirement that a users current programs be able to work on any new operating system. In

18 other words, the PC operating system for which there are the greatest number, variety, and quality of

19 applications will be selected by the large majority of PC users based on their past usage of that

20 operating system, and in turn writers of applications will design their programs to work with the most

21 commonly used operating systems, in order to appeal to as many potential customers as possible.

22 Economies of scale and backward compatibility result in high barriers to entry.

23      104.   The primary channel through which Microsoft distributes its operating systems is pre-

24 installation on new PCs by OEMs. Because a PC can perform virtually no useful tasks without an

25 operating system, OEMs consider it a commercial necessity to preinstall an operating system on

26 nearly all of the PCs they sell. And because there is no viable competitive alternative to the Windows

27 operating system for Intel-based computers, OEMs consider it a commercial necessity to preinstall

28 Windows on nearly all of their PCs. Both OEMs and Microsoft recognize that OEMs have no

COMPLAINT FOR ANTITRUST     - 27 -     CASE NO.

1   commercially viable substitute for Windows, and that they cannot preinstall Windows on their PCs

2   without a license from Microsoft.

3       105.   When Windows 8 is released, it will quickly succeed to the Windows XP, Windows

4   Vista, and Windows 7 monopoly position because, among other things, applications written for

5   Windows XP, Windows Vista, and Windows 7 will run on Windows 8 and most consumers who

6   purchase PCs want and expect their PCs to have a compatible Microsoft operating system. OEMs will

7   begin shipping most PCs, particularly for non-corporate users, with the Windows 8 operating system

8   as soon as it is released.

9       **D.    Microsoft's Position in the Media Processing Software Market**

10      106.   The first media processing software widely used by the general public was, Apple's

11   iDVD software, developed after Apple evaluated MedioStream's technology.

12      107.   Microsoft responded by introducing its own media processing software, which it called

13   the Windows Media platform and related software. Microsoft released the initial version of Windows

14   Media platform and related software (Windows Media 7) in or around 2002. Microsoft has since

15   released Windows Media 9 and related software programs, in each case adding features and

16   functionality to the product.

17      108.   Windows Media platform and related software is, and always has been, viewed by

18   Microsoft and by the market as "media processing software" -a separate software program that allows

19   computer users to efficiently locate, access, display, and manipulate audio and video content.

20   Microsoft and other industry participants carefully track media processing software market share, and

21   Microsoft has frequently and unequivocally stated that increasing its media processing software share

22   is its highest priority corporate goal. Media processing software on a PC has certain product

23   requirements, market usage, demand, distributors, and suppliers distinct from other products,

24   including PC operating systems. These separate attributes, and Microsoft's separate division created

25   for the purpose of developing media processing software, all will continue after Microsoft releases

26   Windows 8. Microsoft plans to continue to distribute and upgrade a stand-alone version of its

27   Windows Media platform and related software, and it has distributed (and plans to continue to

28

1   distribute) versions of Windows Media platform and related software for use on other computer

2   systems.

3          109.   Microsoft's share of the media processing software market has grown steadily from less

4   than 5% in early 1999 to approximately 80% or more today.

5          110.   With the growth of DVDs, HD video cameras, download of music and videos over the

6   internet, consumer demand for media processing software has increased dramatically. Indeed, because

7   of the extraordinary growth and importance of the Internet, the media processing software market is

8   itself a substantial source of potential profits to any company that might achieve a durable dominant

9   position and be able to charge monopoly prices for the efficient use of sound and videos over the

10  Internet. The importance of video and the significant public benefits resulting from its use, make the

11  potential benefit to a monopolist and the potential economic and social cost of monopolization in this

12  market very high.

13              **VII.    COMPETITIVE THREAT TO MICROSOFT'S OS**

14         111.   Much of Microsoft's present monopoly power reflects the fact that Windows is the

15  "platform" on which most popular applications software must run. Media processing software on an

16  integrated PC, however, offers the potential to become an alternative platform on which software

17  applications and programs for video could run instead. In addition, media processing software on an

18  integrated computer can serve as an "interface" --the primary visual environment in which a user

19  performs most computing tasks --to which both the operating system and application programs can be

20  connected. The media processing software thus can be a software "layer" between the operating

21  system and application programs (e.g. application programming interface). Application programs can

22  be and are written using an SDK for the media processing software instead of the operating system

23  interface.

24         112.   Because competing media processing software on a computer operate not only on

25  Windows but also on a variety of other operating systems, their widespread adoption and use would

26  create significant potential to reduce the dependence of most PC users on any particular operating

27  system, such as Windows. The development of numerous software applications not specific to

28  Windows that could ultimately result from the widespread use of non-Microsoft media processing

COMPLAINT FOR ANTITRUST          - 29 -          CASE NO.

1    software on an integrated computer would therefore greatly reduce or eliminate a key barrier that

2    maintains Microsoft's Windows operating system monopoly (because application programs written to

3    interface to a competing media processing software could run on any operating system).

4          113.   Competing media processing software on an integrated computer also threaten

5    Microsoft's Windows monopoly because such media processing software on an integrated platform

6    are a primary distribution vehicle for APIs, the software programs necessary to run programs written

7    using the SDK. Software written with the SDK enable any application so written to run regardless of

8    the operating system on top of which the APIs and application are installed. The widespread

9    distribution of such APIs along with non-Microsoft media processing software on an integrated

10   system could provide another avenue by which applications developers could write programs that are

11   not dependent on Windows, thereby weakening the effects that help entrench Windows' monopoly

12   position in the operating system market.

13              **VIII.    NEED FOR PRELIMINARY RELIEF**

14         114.   In the absence of preliminary relief, consumers will be deprived of their choice of

15   media processing software and consumers and the public will be deprived of the benefits of

16   competition during the pendency of this action. Relief at the conclusion of this case cannot remedy the

17   damage done to consumers and the public during the interim.

18         115.   In addition, the damage to competitors and competition during the pendency of this

19   case that would occur in the absence of preliminary relief cannot practically be reversed later.

20         116.   Aided by Microsoft's anti competitive conduct, Microsoft's share of the media

21   processing software market has increased dramatically from 3% or 4% in early 2002 to approximately

22   90% or more today. In the absence of interim relief, Microsoft's share of the media processing

23   software market will grow substantially as a result, among other things, of Microsoft's tying of its

24   media processing software to Windows 8 and other anti competitive practices.

25         117.   Microsoft's media processing software competitors will be effectively foreclosed from

26   important opportunities to supply alternative media processing software to customers so long as the

27   tie-in and Microsoft's other exclusionary practices continue.

28

118.   In addition, the barriers that exist to the entry of new competitors or the expansion of smaller existing competitors mean that dominance once achieved cannot readily be reversed.

119.   the absence of preliminary relief, the increase in Microsoft's position that will result from its continuing illegal conduct will so entrench it (and so weaken its competitors) that the cost of reversing Microsoft's imminent domination of the media processing software market could be prohibitive."

## IX.   CLAIMS FOR RELIEF

### COUNT 1.
### Unlawful Exclusive Dealing and Other Exclusionary Agreements in Violation of Section 1 of the Sherman Act Against Microsoft

120.   Plaintiff incorporates the allegations of paragraphs 1 through 119 above.

121.   Microsoft's agreements with OEMs to not promote non-Microsoft Media platforms (or to do so only on terms that materially disadvantage such products), unreasonably restrict competition and thus violate Section 1 of the Sherman Act. These agreements unreasonably restrain trade and restrict the access of Microsoft's competitors to significant channels of distribution, thereby restraining competition in the media processing software market, among other markets.

122.   The purpose and effect of these agreements are to restrain trade and competition in the media processing software and PC operating system markets. These agreements violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

123.   The continuing anticompetitive effect of Microsoft's agreements is substantial; any modified agreements are themselves anti competitive and there is a serious threat that, unless enjoined, Microsoft will re-impose the unlawful terms.

### COUNT 2.
### Tying in Violation of Section 1 of the Sherman Act Against Microsoft

124.   Plaintiff incorporates the allegations of paragraphs 1 through 119 above.

125.   Windows operating systems and Microsoft's media processing software are separate products. They are sold in different markets; their functions are different; there is separate demand for

them; and they are treated by Microsoft and by other industry participants as separate products. It is efficient for Microsoft not to tie them and/or to permit OEMs to distribute Windows without Microsoft's media processing software.

126.   Microsoft has tied and plans again to tie its media processing software to its separate Windows operating system, which has monopoly power, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

127.   The purpose and the effect of this tying are to prevent customers from choosing among media processing software on their merits and to foreclose competing media processing software from an important channel of distribution, thereby restraining competition in the media processing software market.

## COUNT 3.
### Monopolization of the PC Operating Systems Market
### in Violation of Section 2 of the Sherman Act
### Against Microsoft

128.   Plaintiff incorporates the allegations in paragraphs 1 through 127 above.

129.   Microsoft possesses monopoly power in the market for PC operating systems. Through the anti competitive conduct described herein, Microsoft has willfully maintained, and unless restrained by the Court will continue to willfully maintain, that power by anti competitive and unreasonably exclusionary conduct. Microsoft has acted with an intent to illegally maintain its monopoly power in the PC operating system market, and its illegal conduct has enabled it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT 4.
### Attempted Monopolization of the Media processing software Market
### in Violation of Section 2 of the Sherman Act
### Against Microsoft

130.   Plaintiff incorporates the allegations of Paragraphs 1 through 127 above.

131.   Microsoft has targeted software products that have the potential to compete with or facilitate the development of products to compete with PC operating systems and thereby to erode

1  Microsoft's Windows operating system monopoly. Microsoft has willfully engaged, and is engaging,

2  in a course of conduct, including tying and unreasonably exclusionary agreements, in order to obtain a

3  monopoly in the media processing software market, and there is a dangerous probability that, unless

4  restrained, it will succeed, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Microsoft has

5  acted with a specific intent to monopolize, and to destroy effective competition in, the media

6  processing software market.

### COUNT 5.
### Unfair Competition (Cal. Bus. & Prof. Code § 17200)
### Against All Defendants

132.   Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 131, inclusive, and incorporates the same herein by reference.

133.   Plaintiff is informed and believes that commencing on a date presently unknown, Defendants are using Plaintiffs Trade Secrets and other confidential and proprietary information.

134.   As a proximate result of Defendants' acts as alleged above, Plaintiff has suffered actual damages through loss of income in a sum to be determined at trial according to proof.

135.   In engaging in the aforementioned acts, Defendants are guilty of malice, oppression and/or fraud in that Defendants acted with deliberate intent to injure Plaintiff's business and improve their own business and/or financial status, or in conscious disregard of Plaintiffs rights. Defendants' conduct therefore warrants the assessment of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

136.   Defendants' wrongful conduct, in using Plaintiffs Trade Secrets and other confidential and proprietary information, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to Plaintiff's business in that Plaintiff has lost customers to Defendants and other, is continuing to lose customers and accounts, and damages would not completely compensate for the injuries to Plaintiffs business and good will.

137.   Plaintiff has no adequate remedy at law for the injuries currently being suffered in that Defendants will continue to wrongfully use Plaintiff's Trade Secrets and other confidential and

proprietary information, and Plaintiff would be required to maintain a multiplicity of judicial

proceedings to protect its interests, and in addition, there is no reasonable basis to calculate all the

monetary damage caused to Plaintiff by the wrongful use of such materials because Plaintiff depends

on customer recommendations or referrals.

**COUNT 6.**
**Misappropriation Of Trade Secrets (Cal. Civ. Code § 3426)**
**Against All Defendants**

138.   Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1

through 137, inclusive, and incorporates the same herein by reference.

139.   At all times relevant to this Complaint, Plaintiff was in possession of its Trade Secrets,

including copyrighted information, information encompassed in research and development, reports,

marketing and sales programs, financial projections, concepts and ideas, materials and information

related to the business and sales of Plaintiff and any affiliated or related entities.

140.   Plaintiff's Trade Secrets had economic value in that its use resulted in the creation of

certain media processing software computer applications and services that offered unique functionality

compared to the usual media processing software applications on the market. Plaintiff's Trade Secrets

were compiled using Plaintiff's ingenuity, time, labor and expense, including, but not limited to,

research and development, marketing, promotional campaigns and advertising. As a result, the Trade

Secrets had economic value in that Plaintiff was able to more effectively and efficiently generate

customer leads, manufacture and merchandise its product and serve its customers than its competitors,

who did not have access to the information, thereby giving Plaintiff a competitive advantage.

141.   Plaintiff made reasonable efforts to ensure that its Trade Secrets remained confidential

and proprietary, including emphasizing to each employee Plaintiff's need to keep the Trade Secrets

secret, and requiring that all employees not disclose any information relating to the Trade Secrets or

other confidential or proprietary information.

142.   As a proximate result of Defendants' acts as alleged above, Plaintiff has suffered actual

damages in a sum to be determined at trial according to proof.

COMPLAINT FOR ANTITRUST            - 34 -            CASE NO.

143. As a further proximate result of the misappropriation, Defendants have been unjustly enriched. The amount of this unjust enrichment cannot presently be ascertained, and Plaintiff will move to amend this Complaint to specify the amount when it becomes known, or on proof thereof.

144. Plaintiff is informed and believes and thereon alleges that the aforementioned acts of Defendants in misappropriating Plaintiff's Trade Secrets were willful and malicious in that Defendants misappropriated Plaintiff's Trade Secrets with a deliberate intent to injure Plaintiff's business and improve their own, thereby warranting an assessment of exemplary damages under California Civil Code § 3426.3(c). Plaintiff is also entitled to reasonable attorneys' fees.

145. The wrongful conduct of Defendants in misappropriating Plaintiffs Trade Secrets, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to Plaintiffs business in that Plaintiff has lost profitable customers and prospective customers and is continuing to lose business, and damages would not completely compensate for the injuries to Plaintiff s business and good will.

146. Plaintiff does not have an adequate remedy at law for the injuries currently being suffered, in that Defendants in all likelihood will continue to misappropriate the Trade Secrets and solicit Plaintiffs customers and prospective customers, and Plaintiff would be required to maintain a multiplicity of judicial proceedings to protect its interests, and, in addition, there is no reasonable basis to calculate all of the monetary damage caused to Plaintiff by the wrongful conduct.

## COUNT 7.
### Conversion
### Against All Defendants

147. Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 146, inclusive, and incorporates the same herein by reference.

148. At all times herein mentioned, Plaintiff was, and still is, the owner, and entitled to possession of certain documents and data and computer data discs that contain or reference Plaintiff s Trade Secrets and other confidential and proprietary information.

149. Plaintiff is further informed and believes, and upon such information and belief alleges, that the above-mentioned property had a value to be determined at trial according to proof.

1   Defendants, and each of them, took and/or permitted to be taken the above-mentioned property from

2   Plaintiff's possession without authorization, and converted the same to their own use and/or to the use

3   of others.

4        150.   As a direct and proximate result of the conversion by Defendants, and each of them,

5   Plaintiff has incurred damages in an amount to be determined at trial according to proof.

6        151.   The aforementioned acts of Defendants, and each of them, in converting said property,

7   was willful, wanton, malicious, fraudulent, intentional and oppressive, and justifies an award of

8   punitive damages in an amount sufficient to punish Defendants.

9                           **X.   PRAYER FOR RELIEF**

10  WHEREFORE, PLAINTIFF PRAYS FOR RELIEF AS FOLLOWS:

11       152.   WHEREFORE, Plaintiff MedioStream, Inc. requests entry of judgment in its favor and

12  against Defendants as follows:

13       a.   That Microsoft's conduct in requiring OEMs to license and distribute the Windows

14            Media platform and related software web media processing software or any other

15            software product as a condition of licensing any Microsoft operating system product

16            violates Sections 1 and 2 of the Sherman Act, 15 §§ 1 and 2;

17       b.   That Microsoft's conduct in requiring or inducing persons to agree not to license,

18            distribute, or promote any non-Microsoft media processing software, or to license,

19            distribute, or promote such media processing software only on terms or under

20            conditions that materially disadvantage it, violates Sections 1 and 2 of the Sherman

21            Act, 15 U.S.C. §§ 1 and 2;

22       c.   That Microsoft has attempted to monopolize the market for media processing software

23            on an integrated media platform in violation of Section 2 of the Sherman Act, 15

24            U.S.C. § 2; and

25       d.   That Microsoft has willfully maintained its monopoly in the market for PC operating

26            systems in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

27       e.   That Microsoft, all persons acting on its behalf or under its direction or control, and all

28            successors thereto, be preliminarily and permanently enjoined from: a. Requiring any

person to license or distribute Microsoft's media processing software software or any other software product or service as a condition of licensing or distributing any Microsoft operating system product; b. Requiring or inducing any person to agree not to license, distribute, or promote any non-Microsoft media processing software software or other software product, or to do so on any disadvantageous, restrictive or exclusionary terms; c. Taking or threatening any action adverse to any person in whole or in part as a direct or indirect consequence of such person's failure to license or distribute Microsoft's media processing software software or other software product, of such person's licensing or distributing any non-Microsoft media processing software or other software product, or of such person's cooperation with the United States; d. Restricting the right of any person to modify the screens, boot-up sequence or functions of any Microsoft operating system product which such person has licensed so as automatically or otherwise to add non-Microsoft media processing software software or other software products, including but not limited to alternative user interfaces, or automatically or otherwise to substitute such non-Microsoft media processing software software or other software product for Microsoft's media processing software software or other software product, so long as such addition or substitution does not materially impair the performance of such Microsoft operating system product;

f.     That the Court enter such other preliminary and permanent relief as is necessary and appropriate to restore competitive conditions in the markets affected by Microsoft's unlawful conduct.

### On the claim for Unfair Competition (Cal. Bus. & Prof. Code §17200)

g.     For an order requiring Defendants to show cause, if any they have, why they should not be enjoined as set forth below, during the pendency of this action; For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Defendants from using Plaintiffs Trade Secrets and other confidential and proprietary

1    information acquired during the scope of Brown's employment with Plaintiff; For

2    trebled damages; For reasonable attorneys' fees; For all costs of suit herein incurred;

3    and For such other and further relief as the court may deem proper.

4    **On the claim for Misappropriation of Trade Secrets (Cal. Civ. Code § 3426)**

5    h.    F or an order requiring Defendants to show cause, if any they have, why they should

6        not be enjoined as hereinafter set forth, during the pendency of this action;

7    i.    For a temporary restraining order, a preliminary injunction, and a permanent injunction,

8        all requiring Defendants and their agents, servants, and employees, and all persons,

9        acting under, in concert with, or for them:.

10    j.    To refrain from using Plaintiffs Trade Secrets and other confidential and proprietary

11        information acquired during any interactions with Plaintiff or its employees.

12    k.    To return possession of Trade Secrets, consisting of copyrighted information,

13        information encompassed in research and development, reports, marketing and sales

14        programs, financial projections, concepts and ideas, materials and information related

15        to the business and sales of Plaintiff and any affiliated or related entities.

16    l.    For general damages and the amount necessary to prevent the unjust enrichment of

17        Defendants in a sum to be determined at trial.

18    m.    For punitive damages.

19    n.    For reasonable attorneys' fees.

20    o.    For all costs of suit herein incurred; and.

21    p.    For such other and further relief as the court may deem proper.

22    **On the claim for Conversion**

23    q.    F or the value of the property converted; For interest at the legal rate on the foregoing

24        sum pursuant to Section 3336 of the Civil Code; For damages for the proximate and

25        foreseeable loss resulting from Defendants' conversion in an amount to be determined

26        at trial; For punitive damages; For costs of suit herein incurred; and F or such other and

27        further relief as the court may deem proper.

28

1 | Dated:  June 22, 2011

Respectfully submitted,

By: _____
Byron Cooper (State Bar No. 166578)
530 Lytton Avenue, Suite 200
Palo Alto, California  94301
Telephone: (650) 283-4244
Facsimile: (650) 617-3201
Email: bcooper@teklaw.co

Attorneys for Plaintiff
MEDIOSTREAM, INC.

1

## JURY DEMAND

2

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff MedioStream hereby demands a trial by jury on all

3

issues triable of right by a jury.

4

Dated:  June 22, 2011

5

Respectfully submitted,

6

By: _____

7

Byron Cooper (State Bar No. 166578)

8

530 Lytton Avenue, Suite 200

Palo Alto, California  94301

9

Telephone: (650) 283-4244

Facsimile: (650) 617-3201

10

Email: bcooper@teklaw.co

11

Attorneys for Plaintiff

MEDIOSTREAM, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28