1
2
3
4 **E-FILED on** _4/23/12_____
5
6
7
8 IN THE UNITED STATES DISTRICT COURT
9 FOR THE NORTHERN DISTRICT OF CALIFORNIA
10 SAN JOSE DIVISION
11

| | |
|---|---|
| 12 MEDIOSTREAM, INC., | No. C-11-03095 RMW |
| 13        Plaintiff, | |
| 14     v. | ORDER GRANTING DEFENDANTS' |
| 15 MICROSOFT CORPORATION; SONIC SOLUTIONS, LLC (f.k.a. SONIC | MOTIONS TO DISMISS |
| 16 SOLUTIONS, INC.); SONY CORPORATION; SONY CORPORATION OF AMERICA; | |
| 17 JAMES TAYLOR; and DOES 1 THROUGH 10 inclusive, | **Re Docket No. 70, 73, 74, 76** |
| 18        Defendants. | |
| 19 | |

20     Defendants Microsoft Corporation ("Microsoft"), Sony Corporation, Sony Corporation of

21 America (collectively, "Sony"), Sonic Solutions, LLC ("Sonic") and James Taylor ("Taylor") move

22 to dismiss plaintiff MedioStream, Inc.'s ("MedioStream") claims for violations of the Sherman Act,

23 misappropriation of trade secrets, unfair competition and conversion. Having considered the parties'

24 briefing and oral argument, the court grants the motions to dismiss with leave to amend within thirty

25 days of the date of this order.

26
27
28

**United States District Court**
For the Northern District of California

**I. BACKGROUND**

MedioStream is a technology company formed in Silicon Valley in 1998. First Amended Compl., Dkt. No. 66 ("FAC") ¶ 19. In 2000, MedioStream developed a product called neoDVDstandard, which allows a user to record video in real-time from a computer onto a DVD or CD disc. *Id.* ¶ 21. By late 2001, MedioStream had built a number of video software products based on its neoDVD platform. *Id.* ¶ 29. Eager to commercialize its technology, MedioStream sought to partner with original equipment manufacturers ("OEMs"), retail outlets, distributors and software publishers in an effort to distribute and sell its video processing products. *Id.* ¶ 30.

Between mid-November 1999 and March 2000, MedioStream held several "discussions" with Apple regarding Apple's potential use of MedioStream's technology. *Id.* ¶ 76. In January 2000, MedioStream representatives attended a meeting with Apple senior executives at Apple's headquarters in Cupertino, California. *Id.* After executing "several" non-disclosure agreements ("NDAs"), Apple "evaluated MedioStream's products and technology." *Id.* While Apple apparently never licensed MedioStream's technology, it allegedly sent the software to Sonic, a company that was developing digital video technology for Apple, "under a secret codename … [and] without the knowledge of MedioStream." *Id.*

Unaware of Sonic's relationship with Apple, MedioStream independently entered into an NDA with Sonic in March 2000. *Id.* ¶ 75. Shortly thereafter, Sonic began "evaluating" beta versions of MedioStream's technology. *Id.* At the same time, under the direction of its chief technologist Taylor, Sonic purportedly "directly copied MedioStream's software and documents associated with that software, and began discussions with Microsoft for the sale of the software to Microsoft." *Id.* ¶ 76.

In 2001, Sonic and Taylor began working closely with Microsoft to develop a platform for the Windows PC operating system that was "very similar" to MedioStream's technology. *Id.* ¶ 77. In or around July 2001, Sonic and Microsoft jointly announced that "major media platform components developed by Sonic would be included in future versions of the Windows operating systems." *Id.* ¶ 77. Microsoft's media processing software, called Windows Media, was allegedly released in or around 2002. *Id.* ¶ 49. According to MedioStream, Microsoft proceeded to engage in

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   a "pattern" of anticompetitive conduct (described in more detail below) to insure that Windows

2   Media was the only media platform included with subsequent versions of the Windows operating

3   system sold as pre-installed software by OEMs.  *See id.* ¶ 50.

4         Also in 2002, MedioStream licensed another technology related to "DVD-VR output" to

5   Sony for use in video cameras and consumer DVD devices.  *Id.* ¶ 81.  Meanwhile, still unaware of

6   Sonic's clandestine association with Microsoft, MedioStream maintained a contractual relationship

7   with Sonic until 2006.  *Id.* ¶ 79.  During that time, Sonic allegedly acquired information related to

8   MedioStream's "employees, technology, business plans, customers, financial information and other

9   trade secrets."  *Id.*  At some point, Sonic also solicited the employment of MedioStream's "key

10  employees."  *Id.*  Furthermore, Sonic "leaked false stories regarding MedioStream's ability to

11  comply with the DVD standard in order to intentionally harm MedioStream's business reputation in

12  the eyes of its key customers, including … Sony."  *Id.* ¶ 81.  Mediostream alleges that Sonic

13  "continues [to this day] to enter into contracts with Sony, Microsoft, Apple and others to supply

14  media platform technology that was created and used by MedioStream, including MedioStream's

15  unique VR format software."  *Id.* ¶ 82.

16  **A.      The Texas Action**

17        On August 28, 2007, MedioStream brought suit against Apple and other defendants in the

18  Eastern District of Texas, alleging infringement of patents related to its video processing technology

19  (the "Texas Action").  *See* Dkt. No. 75-1, Ex. A.[1]  On November 9, 2007, MedioStream amended its

20  complaint to include Sonic and Sony Electronics[2] as co-defendants, and added claims for

21  misappropriation of trade secrets, conversion, and unfair competition against both parties.  *See id.*,

22  Ex. B.  MedioStream did not assert common law claims against Apple in the Texas Action, and later

---

[1]      The court takes judicial notice of the pleadings and orders in the Texas Action under Fed. R. Evid. 201.  *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may … consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment.");  *Molus v. Swan*, No. 05-0452, 2007 WL 2326132, at *6 (S.D. Cal. Aug. 13, 2007) (taking judicial notice of pleadings filed by the plaintiff in an earlier state court action).

[2]      The Second Amended Complaint in the Texas Action named "Sony Electronics" as a defendant, while the defendants in the instant action are "Sony Corporation" and "Sony Corporation of America." The court will assume for the purposes of this motion that the entity named in the Texas Action is distinct from the entities named here.

1   abandoned such claims against Sonic and Sony Electronics.  *See id.*, Ex. D.  In September 2008,

2   MedioStream asserted the same patents against Microsoft in a separate action in the Eastern District

3   of Texas, and in February 2009, the two suits were consolidated.  *See* Dkt. No. 508, Ex. 6 at 2.

4         Discovery in the Texas Action was contentious.  MedioStream filed numerous motions to

5   compel, and in late 2010, the defendants "finally produced large volumes of relevant information

6   regarding MedioStream and its technology that had been sought for years."  FAC ¶ 83.  That

7   material apparently demonstrated "clear patterns of conduct" regarding the allegations that form the

8   basis of the instant lawsuit.  *Id.* ¶ 83.

9         MedioStream filed a complaint in this court on June 23, 2011, alleging causes of action

10   under the Sherman Act against Microsoft, and claims for unfair competition, misappropriation of

11   trade secrets, and conversion against all defendants.  Each defendant moved separately to dismiss.

12   At a Case Management Conference on Sept. 16, 2011, MedioStream requested leave to amend its

13   complaint, and the pending motions to dismiss were terminated.  The FAC, which asserts the same

14   causes of action as the original complaint, was filed on Sept. 30, 2011.

15

16                              **II.  ANALYSIS**

17   **A.      SHERMAN ACT CLAIMS**

18         Section 1 of the Sherman Act prohibits "unreasonable restraints of trade . . . effected by a

19   contract, combination, or conspiracy."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007).

20   Section 2 "punishes any individual or entity that uses 'predatory' means to attain a monopoly, or to

21   perpetuate a monopoly after the competitive superiority that originally gave rise to the monopoly has

22   faded."  *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547 (9th Cir. 1991) (citing

23   *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602, 610-11, (1985)).

24         In order to state a claim under the Sherman Act, the complaint must include "enough fact to

25   raise a reasonable expectation that discovery will reveal evidence of illegal [activity]."  *Twombly*,

26   550 U.S. at 556; *see also Nero AG v. MPEG LA, L.L.C.*, No. 10-CV-3672, 2010 WL 4366448, at *5

27   n.2 (C.D. Cal. Sept. 14, 2010) (noting that the *Twombly* standard applies to both Section 1 and

28   Section 2 claims).  An antitrust complaint must be dismissed where the allegations are "not only

United States District Court
For the Northern District of California

compatible with, but indeed . . . more likely explained by, lawful, unchoreographed free-market behavior." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) (citing *Twombly*, 550 U.S. at 557). As the Ninth Circuit has explained, "discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). A complaint brought under the Sherman Act must therefore contain sufficient factual allegations to state a "plausible claim for relief," when considered in light of the district court's "judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950.

An antitrust claim is also governed by the Sherman Act's four-year statute of limitations. *See* 15 U.S.C. § 15(b); *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 236 (9th Cir. 1987). A cause of action in antitrust accrues "each time a plaintiff is injured by an act of the defendant and the statute of limitations runs from the commission of the act." *Id.* at 237 (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). When an "overt act" in furtherance of an antitrust conspiracy injures the plaintiff within the statute of limitations, the plaintiff may seek damages for any harm incurred during the limitations period. *Hennegan v. Pacifico Creative Service, Inc.*, 787 F.2d 1299, 1300 (9th Cir. 1986). However "[n]ot every act by an antitrust defendant is sufficient to restart the statute of limitations." *Pace*, 813 F.2d at 237. To renew the limitations period, the defendant must commit (1) a "new and independent act that is not merely a reaffirmation of a previous act," and (2) "the act must inflict new and accumulating injury on the plaintiff." *Id.*; *see also In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 72 (9th Cir. 1979) (all injury to appellant necessarily resulted from the pre-limitations rejection of its product, and acts subsequent to that rejection were "but unabated inertial consequences of some pre-limitations action") (internal citations omitted); *compare Hennegan*, 787 F.2d at 1300 (although the defendant's refusals to deal with the plaintiff began outside the limitations period, the claims were not time-barred where the complaint alleged specific, overt acts that injured the plaintiff within the limitations period).

Here, MedioStream brings claims against Microsoft under both Section 1 (exclusive dealing and tying) and Section 2 (monopolization and attempted monopolization) of the Sherman Act.

1  Broadly speaking, the FAC alleges that for more than a decade, Microsoft has sought to exclude

2  competitors in the market for media processing software by entering into exclusionary agreements

3  with OEMs and other entities and by technologically integrating the Windows Media Player with

4  Windows Operating System.  Microsoft contends that all of MedioStream's claims are barred by the

5  statute of limitations and, alternatively, contain insufficient factual support to meet the pleading

6  standard set by *Twombly* and *Iqbal*.  As discussed below, the court finds that the FAC fails under

7  both theories, and therefore grants the motion to dismiss MedioStream's Sherman Act claims.

8  **1.      Exclusionary Agreements**

9       The FAC alleges that Microsoft has executed a variety of unlawful arrangements, including:

10  (1) agreements precluding companies from distributing, promoting, buying or using products made

11  by Microsoft's software competitors or potential competitors; (2) agreements restricting the right of

12  companies to provide services or resources to Microsoft's software competitors or potential

13  competitors, and (3) agreements with OEMs to eliminate the use of other media platforms as

14  preinstalled software on their computer systems and only offer the Windows Media platform.  FAC

15  ¶¶ 50, 63.  Whether construed as exclusive dealing or tying arrangements, such restraints may run

16  afoul of both Section 1 and Section 2 of the Sherman Act if they are found to be anticompetitive

17  under the rule of reason.  *See Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)

18  (an exclusive dealing arrangement may violate the Sherman Act if "the contract will foreclose

19  competition in a substantial share of the line of commerce affected"); *U.S. v. Microsoft Corp.*, 253

20  F.3d 34, 84 (D.C. Cir. 2001) (finding that contractual agreements requiring OEMs to "bundle"

21  Internet Explorer with the Windows Operating System may be unlawful under the rule of reason).

22  "The basic prudential concerns relevant to §§ 1 and 2 are … the same … however, … a monopolist's

23  use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the

24  contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a §

25  1 violation."  *Id.* at 70.

26       **i.      Failure to state a claim**

27       While the FAC's allegations certainly raise the specter of anticompetitive conduct,

28  MedioStream's generalized statements regarding the existence of such agreements are insufficient to

state a plausible claim for relief.  "Terms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement—but a court is not required to accept such terms as a sufficient basis for a complaint."  *Twombly*, 550 U.S. at 557 (quoting *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999)); *see also Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1188 (S.D. Cal. 2002) (allegations that defendants "[c]ontracted, conspired, and agreed to set . . . prices . . . using a vertical price-fixing scheme" were conclusory and insufficient to withstand a motion to dismiss).  Although MedioStream consistently emphasizes that Microsoft "agrees with" or "convinces" OEMs to exclude media platform competitors, it does not allege whether such agreements are written, oral or tacit, when they were executed, who made the decisions, or with which OEMs such agreements were made.  *See Int'l Norcent Tech. v. Koninklijke Philips Electronics N.V.*, No. 07-00043, 2007 WL 4976364, at *10 (C.D. Cal. Oct. 29, 2007) (plaintiff "has not alleged when the purported agreement was made … who made the decision, how it was made or what the parameters of the agreement were.");  *Kendall*, 518 F.3d at 1048 ("The complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?");  *Rick-Mik Enters. v. Equilon Enters., LLC*, 532 F.3d 963, 976 (9th Cir. 2008) ("All that is alleged is there was an agreement on price.  The co-conspirator banks or financial institutions are not mentioned.  The nature of the conspiracy or agreement is not alleged.  The type of agreements are not alleged.").  Without more detail, such allegations do little to "nudge[] [MedioStream's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Furthermore, the complaint fails to include other facts providing "grounds to infer an agreement." *Id.* at 556.  As "evidence" of the existence of unlawful restraints, MedioStream first notes that while it "met with Sony, Hewlett Packard, Dell, Gateway and other OEMs early in the development of its media platform, only Sony adopted MedioStream's [technology] when it was first on the market." FAC ¶ 63.  Given the vast array of reasons why an OEM might choose to adopt one media platform over another, the fact that certain manufacturers did not select MedioStream's technology does not give rise to an inference of an unlawful agreement.  Indeed, as the FAC does not indicate that *other* media platform competitors were similarly passed over, this allegation

United States District Court
For the Northern District of California

1  suggests that MedioStream's rejection had more to do with cost or functionality than far-reaching

2  coercive arrangements.  The FAC also points out that Dell and Hewlett Packard, which allegedly

3  "adhered" to Microsoft's anticompetitive policies, were "rewarded with early evaluation copies of

4  Microsoft's next versions of its operating systems … but other OEMs who have used competing

5  operating systems in the past were not."  *Id.*  That a supplier would provide large and loyal

6  customers with advance versions of new products is rational economic conduct that is at least as

7  likely to be explained by "lawful …. free-market behavior" as by anticompetitive agreements.  *Iqbal*,

8  129 S. Ct. at 1950-51.  MedioStream has therefore failed to place its allegations "in a context that

9  raises a suggestion of a preceding agreement."  *Twombly*, 550 U.S. at 557.[3]

10       The FAC's lack of specificity is particularly troubling given that MedioStream allegedly

11  obtained "large volumes of relevant information" during discovery in the Texas Action.  FAC ¶ 37.

12  In fact, while MedioStream promises that "the documents that prove [its] allegations exist," the

13  pleadings fail to reference *any* of the material produced in discovery.  Dkt. No. 82 at 2.  The court is

14  conscious of the fact that such material may be covered by a protective order.  Nevertheless,

15  MedioStream's inability to plead its claims in more detail despite admittedly having an opportunity

16  to discover relevant evidence supports the conclusion that the FAC does "not permit the court to

17  infer more than the mere possibility of misconduct."  *Iqbal*, 129 S. Ct. at 1950.

18       **ii.     Statute of Limitations**

19       Even if the FAC's allegations were enough to show illegal agreement, the court agrees with

20  Microsoft that claims based on such allegations are time-barred.  The statute of limitations on

21  MedioStream's claims began to run in 2002, when Microsoft allegedly launched the Windows Media

---

24  [3]     The FAC also includes 30 paragraphs describing Microsoft's "long history of violating

25  antitrust laws," including actions brought between 1994 and 2009 by the U.S. Department of Justice, the European Union, South Korea and Russia.  *See* FAC ¶¶ 85-115.  To the extent that MedioStream includes such allegations in an effort to imply Microsoft's propensity for engaging in anticompetitive

26  behavior, the court does not find evidence of past actions–particularly those involving different conduct or products–relevant in considering the current motion.  *Cf.* Fed. R. Evid. 404.

27  Furthermore, such allegations cut both ways, as the fact that Microsoft has been sued so prolifically–and successfully–in the past may make it *less* likely to have engaged in the conduct

28  alleged in the FAC.

United States District Court
For the Northern District of California

1    platform, incorporated it into the Windows operating system,[4] and "essentially force[d] all PC

2    manufacturers … to include the … platform with every PC such manufacturers ship" to the

3    exclusion of competing media products.  FAC ¶ 64.  The FAC must therefore point to a "new and

4    independent act [and] injury" within the limitations period in order to state a claim.  *Pace*, 813 F.2d

5    at 237; *cf. David Orgell, Inc. v. Geary's Stores, Inc.*, 640 F.2d 936 (9th Cir. 1981) (where defendant

6    refused to deal with plaintiff in 1965, 1968, 1976 and 1977, antitrust claims accrued in 1965 because

7    plaintiff's subsequent requests were "forlorn inquiries by one all of whose reasonable hopes had

8    been previously dashed.").

9         MedioStream argues that its allegations are sufficient to restart the statute of limitations

10   because they include "conduct undertaken by Microsoft as late as this year."  Dkt. No. 82 at 8.  It is

11   true that the FAC asserts that Microsoft "has used . . . illegal means to insure that each version of its

12   Windows operating system included only Microsoft's media platform . . . including at least Windows

13   XP, Windows Media Center Edition, Windows Vista, Windows 7, and the recently introduced

14   Windows 8 operating system."  FAC ¶ 50.  However, this allegation, standing alone, is not enough

15   to show that Microsoft engaged in actionable behavior within the limitations period.  "New and

16   independent acts" giving rise to liability might include an agreement *executed* within the limitations

17   period, as well as the "active enforcement" of mutable policies first put into place outside the

18   limitations period.  *Red Lion Medical Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1223 (E.D.

19   Cal. 1999); *Columbia Steel Casting Co. v. Portland General Elec.* Co., 111 F.3d 1427, 1444 (9th

20   Cir. 1996) (power company's refusal to sell power to the plaintiff under an 18–year–old market share

21   division agreement was a new and independent act because the original agreement "was not a

22   permanent and final decision that controlled the later act").  On the other hand, the mere fulfillment

23   of the terms of a "permanent" agreement executed outside the limitations period does not support an

24   antitrust claim.  *See Samsung Elec. Co., Ltd. v. Panasonic Corp.*, No. C 10-03098 JSW, slip op. at 4-

25   7 (N.D. Cal. Aug. 25, 2011) (any injury incurred during the limitations period as a result of a pre-

26   limitations period standards setting agreement was "merely a reaffirmation of a previous decision");

27

28   ---
     [4]    Microsoft notes in its motion to dismiss that elements of the Windows Media platform were in
     fact incorporated into the Windows operating system as early as 1995.  *See* Dkt. No. 70 at 9 n.6.

*AMF, Inc. v. General Motors Corp.*, 591 F.2d 68, 72 (9th Cir. 1979) (no antitrust claim where pre-limitations period agreement not to deal with plaintiff was "irrevocable, immutable, permanent and final").

Here, the FAC plainly does not allege that Microsoft executed an unlawful agreement within the limitations period. Indeed, MedioStream does not explain whether or not Microsoft enters into a new contract with OEMs each time it releases a new version of Windows. Thus, even construing the FAC in the light most favorable to MedioStream, it is not clear whether the continued use of the Windows Media platform by OEMs is alleged to be the result of pre-limitations period agreements or agreements adopted more recently. Accordingly, the court finds that MedioStream has failed to meet its burden to plead the existence of an "overt" anticompetitive act within the limitations period. *Hennegan*, 787 F.2d at 1300.

MedioStream next argues that the statute of limitations should be tolled because Microsoft "actively concealed [its] tortious activities during discovery in the patent litigation." Dkt. No. 80 at 7. Where a plaintiff "suspects the truth but investigates unsuccessfully, fraudulent concealment will toll the statute." *UA Local 343 v. Nor-Cal Plumbing, Inc.,* 48 F.3d 1465, 1475 (9th Cir. 1994). To establish fraudulent concealment, a plaintiff must plead facts showing that a defendant "actively misled" him and that he had "neither actual nor constructive knowledge of the facts constituting [his] claim for relief despite [his] diligence in trying to discover the pertinent facts." *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 788 (N.D. Cal. 2007) (citing *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978)).

MedioStream supports its allegations of fraudulent concealment by citing an October 2010 order in the Texas Action granting a motion to compel Microsoft to produce "source code and design documentation" relevant to that lawsuit. *See* Dkt. No. 468, Ex. 4 at 8.[5] While Microsoft's

---

[5] In its opposition motion, MedioStream also contends that Microsoft concealed its anticompetitive activities by "using Sonic Solutions" to engage in illegal conduct while Microsoft was being investigated for antitrust violations by the Department of Justice. *See* Dkt. No. 82 at 9. In addition to being far too vague to support a finding of fraudulent concealment, such allegations were not included in the FAC, and are therefore not properly before the court on a motion to dismiss. *See Schneider v. Cal. Dep't. of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.").

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS—No. C-11-03095 RMW
EDM                                                                    10

refusal to comply with a discovery request may constitute hardball litigation tactics, neither MedioStream's allegations nor the cited order suggest evidence of fraud or misrepresentation. *See Bernson v. Browning-Ferris Industries*, 7 Cal. 4th 926, 931 (Cal. 1994) (noting that the "defendant's *fraud* in concealing a cause of action against him tolls the applicable statute of limitations") (emphasis added). More importantly, it is difficult to comprehend the relevance of Microsoft's delayed production of source code to the antitrust claims now before the court. The court thus finds that MedioStream's Sherman Act claims against Microsoft based on alleged exclusionary agreements are barred by the statute of limitations.

Microsoft's motion to dismiss such claims is therefore granted. Because MedioStream may be able to allege facts giving rise to a plausible inference that Microsoft engaged in an overt anticompetitive act within the limitations period, the court grants leave to amend.

**2. Product Integration**

The FAC alleges that in addition to adopting unlawful agreements, Microsoft sought to exclude competitors by technologically integrating the Windows Media platform with Windows operating system. *See* FAC ¶ 64 ("Microsoft essentially forces all PC manufacturers, by incorporating the major components of Windows Media platform and related software into all versions of Windows, to include the Windows Media platform with every PC such manufacturers ship."). "As a general rule, courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes." *Microsoft Corp.*, 253 F.3d at 65. A design change that improves a product by providing a new benefit to consumers does not violate the antitrust laws "absent some associated anticompetitive conduct." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 998-99 (9th Cir. 2010). "If a monopolist's design change is an improvement, it is necessarily tolerated by the antitrust laws, unless the monopolist abuses or leverages its monopoly power in some other way when introducing the product." *Id.* at 1000 (internal citations omitted).

MedioStream has not alleged that the integration of the Windows Media platform into the Windows operating system did not provide a new benefit to consumers. Nor has MedioStream shown that Microsoft engaged in actionable conduct in "introducing" the integrated product. *Id.*

**United States District Court**
For the Northern District of California

The FAC alleges that prior to the release of Windows Media in 2002, Microsoft made misleading announcements indicating that: (1) its "free" media platform software would include components that were not actually incorporated until 2007, and (2) the Windows operating system might no longer be compatible with other media software.  *See* FAC ¶ 60.  MedioStream argues that these announcements discouraged customers from purchasing products made by MedioStream and other media platform designers, reducing competition.  However, even if such conduct were anticompetitive, claims arising therefrom would clearly be time-barred because any injury to MedioStream would have occurred when the announcements were made in 2002.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) ("A cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.").  MedioStream also implies that Microsoft has harmed competition by offering its media platform "for free," either as part of a "bundle" with newly purchased Windows operating systems or as an automatic "update" to existing operating system software.  FAC ¶ 57.  Again, it appears from the complaint that such practices have been in place since Windows Media was first introduced, rendering MedioStream's allegations time-barred.  As MedioStream alleges no *additional* anticompetitive conduct associated with subsequent releases of the Windows operating system, such releases are simply "reaffirmation[s] of a previous act" insufficient to restart the statute of limitations.  *Pace*, 813 F.2d at 237.  Simply put, given that "all PC manufacturers" have allegedly "include[d] the Windows Media platform with every PC such manufacturers ship" for nearly a decade, MedioStream has no excuse for failing to bring a product integration claim until now.

Furthermore, even if MedioStream's allegations were timely, the court finds that, as currently pled, the FAC fails to state an antitrust claim under the rule of reason.  MedioStream concedes that consumers can practicably "untie" the Windows Media platform from the Windows operating system, significantly undermining any claim that the integration of the two products is anticompetitive.  *Compare Microsoft Corp.*, 253 F.3d at 95 (noting that Microsoft's removal of the IE [Internet Explorer] entry from the Add/Remove Programs utility in Windows 98 constituted a violation of Section 2 of the Sherman Act).  The FAC also does not allege that the Windows operating system is incompatible with MedioStream's products, nor that consumers who are

United States District Court
For the Northern District of California

dissatisfied with the Windows Media platform cannot simply purchase MedioStream's media processing software directly. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 111 (2d Cir. 2002) (rejecting a Section 1 claim based on exclusive dealing arrangements in part because the plaintiff "clearly has access to alternative distribution channels" by which to reach consumers interested in buying its products). MedioStream does not even suggest that either OEMs or their customers would prefer to purchase the Windows operating system without the Windows Media player. Of course, it goes without saying that "buyers often find package sales attractive." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). This is certainly true in the market for computers, where many consumers expect to buy a pre-installed operating system with broad functionality instead of being required to purchase each application separately. *See Microsoft Corp.*, 253 F.3d at 87 (noting that, taken to an extreme, a ban on bundling would require that the "keyboard, monitor, mouse, central processing unit, disk drive, and memory all [be] sold in separate transactions and likely by different manufacturers."). Moreover, even if the court were to consider MedioStream's allegations under Ninth Circuit law applicable to bundled discounts, the claim must fail because the FAC does not allege that Microsoft's conduct "result[s] in prices that are below an appropriate measure of [its] costs." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 903 (9th Cir. 2008). Therefore, absent allegations of further anticompetitive conduct, MedioStream's product integration claim fails as a matter of law.

Accordingly, the court finds that MedioStream has failed to state a claim based on the technological integration of the Windows Media platform with the Windows operating systems, and grants Microsoft's motion to dismiss. Although the court is skeptical that MedioStream can state a product integration claim, there may be facts showing anticompetitive conduct associated with the integration during the limitations period. Thus, dismissal is granted with leave to amend.

**B.    MISAPPROPRIATION OF TRADE SECRETS CLAIMS**

**1.    Claim against Sonic**

      **i.    Statute of Limitations**

Sonic's alleged misappropriations of trade secrets occurred primarily between 2000 and 2006, when Sonic repeatedly violated its NDA with MedioStream by sharing confidential

1   information with Microsoft.  Sonic argues that MedioStream's trade secrets claim is time-barred

2   because MedioStream knew or should have known about such conduct when it filed the Texas

3   Action in 2007.  Under California law, claims based on the theft of trade secrets are subject to a

4   three year limitations period.  Cal. Civ. Code § 3426.6; *Forcier v. Microsoft Corp.*, 123 F. Supp. 2d

5   520, 525 (N.D. Cal. 2000).  A claim accrues when the misappropriation is "discovered or by the

6   exercise of reasonable diligence should have been discovered."  Cal. Civ. Code § 3426.6.  A plaintiff

7   "discovers" the cause of action when "he at least suspects a factual basis, as opposed to a legal

8   theory, for its elements, even if he lacks knowledge thereof—when, simply put, he at least suspects .

9   . . that someone has done something wrong to him."  *Norgart v. Upjohn Co.*, 21 Cal.4th 383, 397

10  (Cal. 1999) (internal citations omitted).  Because this suit was filed on June 23, 2011, if the FAC

11  shows that MedioStream knew or should have known of Sonic's alleged misconduct by June 23,

12  2008, its trade secrets claim must be dismissed.  *See Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682

13  (9th Cir. 1980) (a court may dismiss a cause of action if the complaint shows on its face that the

14  plaintiff's claims are barred by the statute of limitations).

15          Judicially noticeable documents demonstrate that in the 2007 Texas Action, MedioStream

16  sued Sonic for the misappropriation of trade secrets largely encompassing the material described in

17  the FAC, indicating that Mediostream was aware of the factual basis for its claims nearly four years

18  before initiating this suit.[6]  Indeed, the alleged misconduct asserted in both actions is substantially

19  similar.  For example, MedioStream alleged in 2007 that Sonic had "intentionally and knowingly

20  disclosed MedioStream's confidential and proprietary information, without MedioStream's

21  permission or consent to third parties."  Dkt. No. 77, Ex. A ¶ 42.  MedioStream now claims that

22  Sonic "was passing all the information [it] learned about MedioStream … to Microsoft."  FAC ¶ 79.

23  While MedioStream now defines both its secret material and Sonic's conduct with added detail,

---

24  [6]      The trade secret information identified in the Texas Action includes "computer software

25  code, computer-related devices and methods, techniques and processes, documentation and plans, its
    knowledge of persons in the industry with special talents and knowledge regarding its current and

26  future products, and related techniques and know how developed by MedioStream."  Dkt. No 72,
    Ex. D ¶ 27.  The trade secrets identified in this litigation include: (1) unpublished patent

27  applications; (2) methods for practicing MedioStream's DVD-VR optical disc format; (3) the names
    and special skills of MedioStream's engineers; (4) business plans and strategies; and (5) customer

28  information, financial statements, technical specifications, algorithms, source code and marketing
    materials."  Dkt. No. 66 ¶ 32-35.

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS—No. C-11-03095 RMW

EDM                                                    14

**United States District Court**
For the Northern District of California

1   California law does not allow a plaintiff to reassert the same claims after the statute of limitations

2   has run by simply making its allegations more specific. *Cf. Intermedics v. Ventritex*, 822 F. Supp.

3   634, 653 (N.D. Cal. 1993) ("California authorities would be most troubled … by a scenario in which

4   a plaintiff who clearly knew that most of its related trade secrets had been misappropriated five

5   years before filing its complaint could nonetheless maintain a cause of action by manipulating the

6   definitions of pieces of its intellectual property in order to support a contention that the first

7   misappropriations of some of those pieces took place within the three year statutory period.").

8   Furthermore, to the extent that MedioStream claims that Sonic has continued to use or sell

9   misappropriated material during the limitations period, such allegations do not restart the statute of

10   limitations. *See Cadence Design Sys., Inc. v. Avant! Corp.*, 29 Cal.4th 215, 225 (Cal. 2002)

11   (subsequent uses of misappropriated material may augment the initial claim but do not give rise to

12   new claims). The pleadings in the Texas Action thus strongly suggest that MedioStream had actual

13   notice of the facts underlying its trade secret claim against Sonic in 2007.

14          In its responsive brief, MedioStream argues that its claims against Sonic are not time-barred

15   because its current allegations are "unrelated" to those asserted in the Texas Action. *See* Dkt. No. 97

16   at 1. Specifically, MedioStream contends that allegations regarding Sonic's theft and sale of "unique

17   VR format software" were not raised in the 2007 lawsuit because such misappropriations did not

18   occur until a group of engineers left MedioStream to join Sonic in 2008. *See id.* at 2. These facts

19   were not included in the FAC, and therefore are not properly before the court on a motion to

20   dismiss. *See Schneider v. Cal. Dep't. of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In

21   determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to

22   a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to

23   dismiss."). Moreover, under California law, "[w]hen the statute of limitations begins to run on some

24   of a plaintiffs trade secret claims against given defendants, the statute also begins to run at the same

25   time as to other trade secret claims against those same defendants, even if there have not yet been

26   any acts of misappropriation of the other trade secrets, at least when the plaintiff shared all the trade

27   secrets with the defendants during the same time period and in connection with the same

28   relationships and when the trade secrets concern related matters." *Forcier v. Microsoft Corp.*, 123 F.

Supp. 2d 520, 525 (N. D. Cal. 2000); *see also Intermedics, Inc.*, 822 F. Supp. at 653 ("It is the first known (or reasonably discoverable) breach of that [confidential] relationship that creates the right to sue and thus triggers the running of the statute of limitations.  The specific nature of the second breach, in relation to the specific nature of the first breach, should make no difference."); *HiRel Connectors, Inc. v. U.S.*, 465 F. Supp. 2d 984, 988 (C.D. Cal. 2005) ("When a plaintiff brings suit against an individual defendant for separate misappropriations of related trade secrets . . . the date of accrual is the date of the initial misappropriation.").  Thus, Sonic need not show that the secrets identified in both actions are identical, only that they are *related*.  Here, the FAC indicates that the trade secrets described in both actions were shared with Sonic between 2000 and 2006, and concern similar technology developed for use in similar products.  *See Forcier*, 123 F. Supp. 2d at 526 ("The alleged trade secrets at issue all are related because they were developed for use in the same sophisticated and highly specialized product.").  Further, just as MedioStream now claims that its former engineers shared "VR format software" after joining Sonic, FAC ¶ 82, the 2007 complaint alleged that Sonic hired MedioStream's "key employees" in order to access "confidential information" regarding its "products" and "technology."  Dkt. No 72, Ex. D ¶ 27.  Having discovered such alleged practices by 2007, MedioStream had a duty to investigate and monitor further misappropriations by Sonic.  Accordingly, the court finds that MedioStreams trade secret claims against Sonic are time-barred.

### ii. Fraudulent Concealment

As with Microsoft, MedioStream argues that even if it could have discovered Sonic's actions earlier, the statute of limitations should be tolled because of misconduct during discovery in the Texas Action.  Again, MedioStream points to an order issued in that lawsuit requiring the production of source code, *see* Dkt. No. 468, Ex. 4 at 8, but provides no evidence of fraud or misrepresentation.  Furthermore, because MedioStream's 2007 allegations against Sonic demonstrate *actual* knowledge of purported misconduct (or at least knowledge sufficient for Rule 11's pleading requirements), the doctrine of fraudulent concealment is inapplicable.  *See Rutledge*, 576 F.2d at 250.  As the FAC contains no other facts supporting a fraudulent concealment claim, the court finds that MedioStream has failed adequately demonstrate that the statute of limitations should be tolled.

United States District Court
For the Northern District of California

1    The court therefore grants Sonic's motion to dismiss Mediostream's trade secret claims.

2    Mediostream may amend its complaint to include facts showing that its allegations concerning the

3    misappropriation of its VR technology are unrelated to its 2007 allegations, or any additional facts

4    supporting its claim that Sonic fraudulently concealed information relevant to its trade secret claims.

5

6    **2.    Claims against Taylor and Microsoft**

7    Taylor and Microsoft argue that any claims against them concerning the theft of trade secrets

8    are similarly barred by the statute of limitations.  Although Taylor was not named as a defendant in

9    the Texas Action, the allegations against him are inextricably intertwined with MedioStream's

10   claims against Sonic.  In fact, all of the allegations against Sonic appear to be premised on conduct

11   undertaken by Taylor.  *See* FAC ¶ 76 ("Sonic Solutions, using a new division under the direction of

12   Taylor, directly copied MedioStream's software and documents associated with that software, and

13   began discussions with Microsoft for the sale of the software to Microsoft."); *id.* ¶ 79 ("Taylor was

14   secretly passing all the information Sonic learned about MedioStream . . . to Microsoft.").  Having

15   learned of Sonic's alleged misappropriations by 2007, MedioStream should have discovered through

16   reasonably diligent investigation that Taylor was the employee responsible for such misconduct.  *Cf.*

17   *Wistron Corp. v. Phillip M. Adams & Associates, LLC*, No. 10-4458, 2011 WL 4079231, at *6 (N.D.

18   Cal. Sept. 12, 2011) ("Once Adams was on notice of the Winbond chips, it should have discovered

19   through a reasonably diligent investigation that other companies (such as [the defendants]) used the

20   chips.").  Accordingly, the court concludes that MedioStream's claims against Taylor also accrued in

21   2007.

22   MedioStream's claims against Microsoft are also based on the same nucleus of facts as its

23   allegations against Sonic.  *See* FAC ¶ 76 ("Sonic Solutions . . . directly copied MedioStream's

24   software and documents associated with that software, and began discussions with Microsoft for the

25   sale of the software to Microsoft.").  Where one party acquires trade secrets and later sells them to a

26   third-party, claims against both parties generally accrue upon the initial misappropriation.  *See*

27   *Forcier*, 123 F. Supp. 2d 520 (where plaintiff's claim for misappropriation by a company later

28   acquired by Microsoft was untimely, claims against Microsoft for its use of the misappropriated

material were also time-barred); *Ashton–Tate Corp. v. Ross*, 728 F. Supp. 597, 603 (N.D. Cal. 1989) (the initial act of misappropriation by one party began the running of the statute of limitations for that party and for a third party that obtained the trade secrets from the first party and used them for its own purposes). As with Taylor, MedioStream should have discovered Microsoft's alleged complicity during its prosecution of the Texas Action. *See Wistron Corp.*, 2011 WL 4079231, at *6 (dismissing trade secrets claims against computer manufacturers accused of obtaining misappropriated material from a third party because plaintiff had earlier discovered the conduct of the third party). This is especially true given that the widespread release of the Windows Media platform, which is allegedly "very similar" to MedioStream's proprietary technology, should have given MedioStream reason to suspect that its technology had been misappropriated. *See Stutz Motor Car of Am. v. Reebok Int'l*, 909 F. Supp. 1353, 1362 (C.D. Cal. 1995) ("Based on the advertising, media reporting, and distribution of the Pump line of shoes described above, the Court does FIND that sufficient widespread publicity existed for plaintiff to be charged with constructive knowledge of the Reebok products and the potential use of Stutz's trade secrets."). The court thus concludes that MedioStream knew or should have known of Microsoft's alleged misappropriations by 2007.

### i.  Fraudulent Concealment

MedioStream again argues that even if it could have discovered Taylor's and Microsoft's involvement in 2007, the limitations period should be tolled because of defendants' "active[] conceale[ment] of their tortious activities." Dkt. No. 80 at 7. As discussed above, MedioStream appears to base its allegations regarding fraudulent concealment on various orders issued in the Texas Action. However, the materials to which it points do not demonstrate any conduct in the Texas Action that was wrongful, let alone actions that prevented discovery of Taylor's or Microsoft's participation in Sonic's alleged actions. To avoid the bar of limitation by invoking the doctrine of fraudulent concealment, the plaintiff "must plead with particularity the circumstances surrounding the concealment and state facts showing his due diligence in trying to uncover the facts." *Rutledge*, 576 F.2d at 250 (declining to find fraudulent concealment where plaintiff had previously expressed suspicion about one of the defendants). Having failed to identify such circumstances here, Mediostream cannot rely on conclusory allegations of concealment to preserve its claims.

United States District Court
For the Northern District of California

Accordingly, the court grants the motion to dismiss trade secret claims on behalf of Taylor and Microsoft. Mediostream may amend its complaint include facts showing why it could not have discovered the facts underlying its claims against either party when it filed the Texas Action in 2007.

**3.      Claim against Apple**

The FAC alleges that in 2001, Apple violated "several NDAs" by passing MedioStream's "products and technology" to Sonic "under a secret codename … [and] without the knowledge of MedioStream. FAC ¶ 76. Apple argues that any claims based on such allegations are time-barred, or alternatively, fail to identify the allegedly misappropriated material with sufficient particularity to state a claim.

**i.      Statute of Limitations**

Apple first contends that Mediostream knew or should have known of its alleged 2001 misappropriation at the time the Texas Action was initiated in 2007. The court disagrees. Although Apple is a party to the Texas Action, it was never the subject of a trade secrets claim, nor is it alleged to have obtained proprietary material from Sonic. Furthermore, it is not clear that the material supposedly disclosed by Apple is related to the material underlying the claims against Sonic or the other defendants. It is therefore conceivable that in investigating its trade secrets claim against Sonic, MedioStream would not have discovered that Apple had allegedly passed proprietary information to Sonic at the same time that Sonic was passing proprietary information to Microsoft. The court is therefore reluctant to conclude that MedioStream's claim against Apple is time-barred. *See HiRel Connectors, Inc.*, 465 F. Supp. 2d at 989 ("In [trade secrets actions] involving multiple defendants, there may be multiple dates of accrual.").

**ii.      Failure to state a claim**

Apple next argues that Medistream has failed to identify the trade secrets allegedly disclosed to Sonic in 2001 with sufficient particularity. In order to state a claim under the California Uniform Trade Secrets Act ("CUTSA"), a plaintiff must plead facts sufficient to show (1) the existence of subject matter which is capable of protection as a trade secret; (2) that the secret was disclosed to the defendant under circumstances giving rise to an obligation not to use or disclose the secret to the detriment of the discloser; and (3) the defendant either used the trade secret or disclosed it to a third party. *GlobeSpan,*

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   *Inc. v. O'Neill*, 151 F. Supp. 2d 1229, 1235 (C.D. Cal. 2001).  In addition, the plaintiff must "describe

2   the subject matter of the trade secret with sufficient particularity to separate it from matters of general

3   knowledge in the trade . . . to permit the defendant to ascertain at least the boundaries within which the

4   secret lies."  *Farhang v. Indian Inst. of Tech., Kharagpur*, No. C-08-2658, 2010 WL 2228936, at *13

5   (N.D. Cal. 2010) (citing *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (Cal. Ct. App. 1968)).  The

6   complaint need not "spell out the details of the trade secret" but must identify the trade secret with

7   sufficient particularity to give defendants "reasonable notice of the issues which must be met at the time

8   of trial and to provide reasonable guidance in ascertaining the scope of appropriate discovery."  *Id.*

9     The FAC identifies MedioStream's trade secret material as: (1) unpublished patent applications;

10  (2) methods for practicing MedioStream's DVD-VR optical disc format; (3) the names and special skills

11  of MedioStream's engineers; (4) business plans and strategies; and (5) customer information, financial

12  statements, technical specifications, algorithms, source code and marketing materials.  FAC ¶ 32-35.

13  While such material may contain trade secrets, MedioStream has failed to identify which, if any, of the

14  trade secrets described in the complaint were encompassed in the "products and technology" obtained

15  by Apple in 2001.  *See S. Cal. Inst. of Law v. TCS Educ. Sys.*, No. 10–8026, 2011 WL 1296602, at *7

16  (C.D. Cal. April 5, 2011) (dismissing claim for misappropriation of trade secrets where plaintiff failed

17  to identify the trade secrets contained within a number of documents that defendant had been permitted

18  to access pursuant to an NDA).  As most of the conduct described in the FAC concerns the passage of

19  information between Sonic and Microsoft, it is entirely unclear whether the trade secrets purportedly

20  disclosed by Apple include some or all of the same material misappropriated by other parties.

21    Furthermore, the MedioStream-Apple NDA covers only "MPEG2 bit-streams compressed using

22  Medio Systems MVision MPEG2 encoder."  Dkt. No. 75-6, Ex. E.[6]  The trade secrets identified in the

23  FAC do not include "MPEG2 bit-streams," nor does the FAC allege that Apple transferred such bit-

24  streams to Sonic.  The FAC therefore does not show that Apple disclosed secret material to Sonic in

25

26  _____

27  [6] The court may consider the contents of the Apple-MedioStream NDA under the
    incorporation by reference doctrine, which permits consideration of documents "whose contents are
    alleged in a complaint and whose authenticity no party questions, but which are not physically
28  attached to the [plaintiff's] pleading."  *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d
    970, 986, (9th Cir. 1999).

**United States District Court**
For the Northern District of California

1   violation of an "obligation on the part of the disclosee not to use or disclose the secret." *GlobeSpan, Inc.*,

2   151 F. Supp. 2d at 1235.

3   Accordingly, the court finds that MedioStream has failed to state a claim based on Apple's

4   alleged 2001 misappropriation of confidential material.  MedioStream may amend its complaint to

5   identify with sufficient particularity the trade secrets allegedly misappropriated by Apple.

6   **4.      Claim against Sony**

7   The basis of MedioStream's trade secrets claim against Sony is somewhat unclear.  In fact,

8   most of the allegations that reference Sony indicate that the parties had a productive licensing

9   relationship.  *See, e.g.*, FAC ¶ 60 ("Despite Microsoft's early announcements designed to thwart

10  MedioStream's marketing and sales efforts, MedioStream was nonetheless able to license its media

11  platform technology to Sony Corporation of Japan, and all of its subsidiaries worldwide.").  At best,

12  the FAC could be construed to allege that Sony has *indirectly* misappropriated trade secrets by

13  entering into contracts with Sonic to purchase "media platform technology that was created and used

14  by MediStream, including MedioStream's unique VR format software."  FAC ¶ 83.

15  The elements of a claim of indirect trade secret misappropriation under California Civil Code

16  § 3426 are: (1) the plaintiff is the owner of a valid trade secret; (2) the defendant acquired the trade

17  secret from someone other than the plaintiff and (a) knew or had reason to know before the use or

18  disclosure that the information was a trade secret and knew or had reason to know that the disclosing

19  party had acquired it through improper means or was breaching a duty of confidentiality by

20  disclosing it; or (b) knew or had reason to know it was a trade secret and that the disclosure was a

21  mistake; (3) the defendant used or disclosed the trade secret without plaintiff's authorization; and (4)

22  the plaintiff suffered harm as a direct and proximate result of the defendant's use or disclosure of the

23  trade secret, or the defendant benefitted from such use or disclosure.  *See California Police Activities*

24  *League v. California Police Youth Charities, Inc.*, No. 08-1991, 2009 WL 537091, at *3 (N.D. Cal.

25  March 3, 2009).

26  Sony argues that the FAC fails to include facts demonstrating that it knew or had reason to

27  know that any information it allegedly acquired from Sonic was improperly acquired or disclosed.

28  While the court believes this is a close question, it agrees with Sony.  Sony was plainly familiar with

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS—No. C-11-03095 RMW
EDM                                                          21

United States District Court
For the Northern District of California

1  MedioStream's VR technology; the two companies appear to have maintained a licensing

2  relationship for years.  However, the FAC does not assert that at the time Sony allegedly began

3  obtaining such technology from Sonic, Sony had any knowledge that MedioStream's contractual

4  relationship with Sonic had soured, that Sonic was not authorized to supply VR technology similar

5  to that developed by MedioStream, or even that Sony had stopped dealing directly with

6  MedioStream.  In its reply brief, MedioStream paints a clearer picture of its grievance, arguing that

7  Sony essentially "switched from MedioStream to Sonic as a provider of the technology" with full

8  knowledge that it was acquiring MedioStream's trade secrets without authorization.  Dkt. No. 96 at

9  2.  However, as this allegation was included only on reply, Sony has had no opportunity to respond,

10  and thus it cannot be considered on a motion to dismiss.

11      The court therefore finds that the FAC fails to state a claim against Sony for

12  misappropriation of trade secrets.  MedioStream may amend its complaint to include facts

13  demonstrating that Sony knew or should have known that it was unlawfully obtaining confidential

14  material from Sonic.

15  **C.      CONVERSION AND UNFAIR COMPETITION CLAIMS**

16  **1.      Preemption under the California Uniform Trade Secrets Act ("CUTSA")**

17      Defendants argue that MedioStream's claims for conversion and unfair competition under

18  Cal. Bus. & Prof. Code § 17200 are preempted by the CUTSA.  This court has previously held that

19  the CUTSA "preempts" common law claims that are "based on the same nucleus of facts as the

20  misappropriation of trade secrets claim for relief."  *Digital Envoy, Inc. v. Google, Inc.*, 370 F. Supp.

21  2d 1025, 1035 (N.D. Cal. 2005) (Seeborg, M.J.) (CUTSA preempts claims for unfair competition

22  and unjust enrichment).  Statutory unfair competition claims may also be preempted by the CUTSA.

23  *See AirDefense, Inc. v. AirTight Networks, Inc.*, No. 05-04615, 2006 WL 2092053 (N.D. Cal. July

24  26, 2006) (Fogel, J.) (finding preemption of claims for statutory and common law unfair

25  competition, conversion, intentional interference with contractual relations, and unjust enrichment);

26  *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 954 (Cal. Ct.

27  App. 2009) (Section 17200 claim preempted).  Preemption is not triggered where the facts

28  underlying an independent claim are "similar to, but distinct from, those underlying the

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS—No. C-11-03095 RMW

EDM                                    22

United States District Court
For the Northern District of California

1   misappropriation claim." *Axis Imex, Inc., v. Sunset Bay Rattan, Inc.,* No. C 08-3931, 2009 WL

2   55178, at *5 (N.D. Cal. January 7, 2009). "The preemption inquiry . . . focuses on whether other

3   claims are no more than a restatement of the same operative facts supporting trade secret

4   misappropriation. . . . If there is no material distinction between the wrongdoing alleged in a

5   [C]UTSA claim and that alleged in a different claim, the [C]UTSA preempts the other claim."

6   *Gabriel Techs. Corp. v. Qualcomm Inc.*, No. 08-1992, 2009 WL 3326631, at *35 (S.D. Cal. Sept. 3,

7   2009) (citing *Convolve, Inc. v. Compaq Computer Corp.*, 2006 WL 839022, at *6 (S.D.N.Y.)

8   (applying California law)).

9        Several recent decisions have found that the CUTSA preempts claims based on the alleged

10  taking of "confidential information," even if such information does not qualify as a trade secret.  *See*

11  *Mattel, Inc. v. MGA Entertainment, Inc.*, 782 F. Supp. 2d 911, 987 (C.D. Cal. 2011). ("In an effort to

12  align with the California courts that have addressed this issue, the Court concludes that UTSA

13  supersedes claims based on the misappropriation of confidential information, whether or not that

14  information meets the statutory definition of a trade secret."); *Silvaco Data Systems v. Intel Corp.*,

15  184 Cal. App. 4th 210, 239 n.22 (Cal. Ct. App. 2010) ("We emphatically reject the . . . suggestion

16  that the uniform act was not intended to preempt common law conversion claims based on the taking

17  of information that, though not a trade secret, was nonetheless of value to the claimant.") (internal

18  citations omitted).  As the California Court of Appeal has explained:

19        A prime purpose of the [USTA] was to sweep away the adopting states' bewildering
         web of rules and rationales and replace it with a uniform set of principles for
20       determining when one is—and is not—liable for acquiring, disclosing, or using
         "information . . . of value."  Central to the effort was the act's definition of a trade
21       secret.  Information that does not fit this definition, and is not otherwise made
         property by some provision of positive law, belongs to no one, and cannot be
22       converted or stolen . . . [P]ermitting the conversion claim to proceed on a contrary
         rationale . . . impliedly create[s] a new category of intellectual property far beyond
23       the contemplation of the Act, subsuming its definition of "trade secret" and
         effectively obliterating the uniform system it seeks to generate.
24
    *Id.* (internal citations omitted).

25        Conversely, other courts have held that claims based on the misappropriation of non-trade

26  secret information are not preempted.  *See, e.g.*, *E-Smart Techs., Inc. v. Drizin*, No. C-06-05528,

27  2009 U.S. Dist. LEXIS 272 (N.D. Cal. Jan. 5, 2009) (Patel, J.) (coversion claim based on the

28

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS—No. C-11-03095 RMW
EDM                                                        23

1    misappropriation of business opportunities and tangible items were not preempted); *Amron Intern.*

2    *Diving Supply, Inc. v. Hydrolinx Diving Communication, Inc.*, No. 11-CV-1890, 2011 WL 5025178,

3    at *10 (S.D. Cal. 2011) (Huff, J.) (common law causes of action were not preempted because they

4    were based on different "allegations" than the plaintiff's trade secrets claim).  In addition, some

5    courts have concluded that the preemption issue cannot be addressed at the pleading stage "prior to

6    determining whether the allegedly misappropriated information constitutes a trade secret." *Amron*

7    *Intern. Diving Supply, Inc.*, 2011 WL 5025178, at *10.  Thus, while it is clear that the CUTSA

8    preempts certain claims related to the misappropriation of secret information, the preemptive scope

9    of the statute remains a somewhat unsettled area of California law.

10          **i.      Conversion  Claim**

11          MedioStream's conversion claim alleges that defendants "took and/or permitted to be taken

12   ... certain documents and data and computer data discs that contain or reference Plaintiff's Trade

13   Secrets and other confidential and proprietary information."  FAC ¶¶ 168-69.  MedioStream argues

14   that the claim is not preempted because it is "based on property taken from MedioStream's facilities

15   by former employees and provided to defendants.  These allegations are not the same as the trade

16   secret theft allegations."  Dkt. No. 81 at 12.  However, MedioStream does not identify such

17   "property," nor make any attempt to distinguish it from the trade secret material identified in the

18   FAC.  Furthermore, a review of the allegations in the complaint strongly suggests that all of the

19   property purportedly misappropriated by defendants is included within MedioStream's expansive

20   definition of its trade secrets.  *See* FAC ¶¶ 32-35.  Given the clear uniformity between the two

21   claims on the face of the FAC, the court need not decide whether allegations regarding the theft of

22   non-trade secret information could *ever* escape preemption under the CUTSA.  On these pleadings,

23   it is plain that MedioStream's conversion claim is "no more than a restatement of the same operative

24   facts supporting trade secret misappropriation," and therefore preempted by the CUTSA.  *Gabriel*

25   *Techs. Corp.*, 2009 U.S. Dist. LEXIS 98379, at *35.

26          The court thus grants defendants' motions to dismiss MedioStream's conversion claims.

27   However, because MedioStream may be able to state a claim for conversion based on allegations

28   different from those that form the basis of its trade secrets claim, dismissal is granted with leave to

United States District Court
For the Northern District of California

1    amend.

2         **ii.      Section 17200 claim**

3         MedioStream's statutory unfair competition claim is based on the allegation that "Defendants

4    are using Plaintiffs Trade Secrets and other confidential and proprietary information . . . with

5    deliberate intent to injure Plaintiff's business and improve their own business and/or financial

6    status." FAC ¶¶ 153, 155.  Again, the court sees no difference between these allegations and those

7    that form the basis of MedioStream's trade secrets claim.  Accordingly, the court finds that

8    MedioStream's Section 17200 claim is preempted by the CUTSA and grants defendants' motions to

9    dismiss MedioStream's unfair competition claim.

10        In its opposition brief, MedioStream argues for the first time that its unfair competition claim

11   is based on allegations of wire fraud, libel and slander, rather than the use of misappropriated

12   material.  The court will not consider such allegations here, but will allow MedioStream leave to

13   amend its complaint accordingly.  *See Broam v. Bogan*, 320 F.3d 1023, 1026 n. 2 (9th Cir. 2003)

14   ("Facts raised for the first time in plaintiff's opposition papers should be considered by the court in

15   determining whether to grant leave to amend or to dismiss the complaint with or without prejudice.")

16

17                                   **III.  ORDER**

18

19        For the foregoing reasons, the court decides the motions as follows:

20        1.    The motion to dismiss MedioStream's Sherman Act claims (Counts 1-4) is granted with
               leave to amend.

21

22        2.    The motions to dismiss MedioStream's unfair competition claim (Count 5) are granted
               with leave to amend.

23

24        3.    The motions to dismiss MedioStream's misappropriation of trade secrets claim (Count
               6) are granted with leave to amend.

25

26        4.    The motions to dismiss MedioStream's conversion claim (Count 7) are granted with
               leave to amend.

27

28

Any amended complaint must be filed and served within 30 days of the date of this order.

DATED:      April 23, 2012

*Ronald M. Whyte*

RONALD M. WHYTE
United States District Judge